UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

In re:

Griswold Building, LLC, et al.,[1]

      Debtors.

_____/

Case No. 09-57520
Chapter 11 Jointly Administered
Hon. Phillip J. Shefferly

## OPINION DENYING CONFIRMATION OF DEBTORS' PLAN OF REORGANIZATION

### I. INTRODUCTION

This opinion addresses the Debtors' request for confirmation of their combined joint plan of reorganization and disclosure statement. Dime, LLC, as administrative agent for Wells Fargo Bank, N.A. and Fifth Third Bank (collectively referred to as the "Lender") objected to confirmation. The Court held an evidentiary hearing on confirmation over five days, on November 4, 5, 6, 9, and 12, 2009. The Debtors called five witnesses to testify in support of their request for confirmation, and introduced Debtors' Exhibits 1 through 28, 31, 34 through 44, and 47 through 49 into evidence. The Lender called four witnesses in support of its objections to confirmation, and introduced Lender's Exhibits 1001 through 1036, a portion of 1040, 1042 through 1053, 1055 through 1056, 1059, and 1063 through 1076. The Court has carefully considered the Debtors' plan, their brief in support of confirmation, the Lender's objections to confirmation and its brief in support of those objections, the testimony of the nine witnesses, and the exhibits introduced into evidence. For the reasons explained in this opinion, the Court has determined to deny confirmation

_____

[1] The above-captioned Debtor's case is being jointly administered with the cases of Griswold Properties, LLC, Case No. 09-57521, and Colossae, LLC, Case No. 09-57523.

of the Debtors' plan of reorganization. This opinion constitutes the Court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052 with respect to the Debtors' request for confirmation and the Lender's objections to confirmation.

## II. JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

## III. FACTS

The Debtors are three related entities: Griswold Building, LLC, Griswold Properties, LLC, and Colossae, LLC (collectively referred to as the "Debtors"). The Debtors are managed by another related entity, BOSC Capital Equities, LLC ("BOSC"). Waad Nadhir ("Nadhir") is the owner and principal of BOSC. Nadhir also owns, either directly or indirectly, a controlling interest in each of the Debtors. The business of the Debtors consists of the ownership and operation of an office building and an adjacent parking garage in downtown Detroit, Michigan. Griswold Building, LLC owns the office building located at 719 Griswold Street, commonly known as the "Dime Building." The garage actually consists of two separate garages, known as the "Old Garage" and the "New Garage." The garages are physically and functionally interconnected, and operate as a single unit. Griswold Properties, LLC owns the Old Garage. Colossae, LLC owns the New Garage. Colossae, LLC also owns a vacant office building located at 751 Griswold Street, known as the "Olde Building."

The centerpiece of the Debtors' assets is the Dime Building. According to Nadhir's testimony, the Dime Building was constructed in 1912, and was designed by a well known architect, Daniel Burnham, who developed many highly regarded buildings, including several in Detroit. The

-2-

building consists of 23 stories with a u-shaped floor plate. Despite its original prominence, the condition of the building and its occupancy rate deteriorated over time, much like other office buildings in the downtown Detroit central business district. In 1999, Nadhir put together a group of investors to purchase the Dime Building and the Old Garage, with the intention of renovating them. At that time, the Dime Building was in a severely dilapidated state, and had an occupancy rate of roughly 30%, with tenants scattered throughout the building.

The investors obtained the original financing for the purchase and renovation from GMAC. In 2004, Griswold Building, LLC and Griswold Properties, LLC wished to refinance the Dime Building and the Old Garage, and also expand the parking facilities by constructing the New Garage. Colossae, LLC was formed to construct the New Garage. On October 7, 2004, the Debtors entered into a Credit Agreement (Exhibit 1001) with the Lender to refinance the Dime Building, refinance the Old Garage, and provide construction funds for the New Garage. The promissory note for the Dime Building (Exhibit 1003) was in the amount of $22,557,000.00. The promissory note for the Old Garage (Exhibit 1004) was in the amount of $7,360,000.00. The promissory note for construction of the New Garage was in the amount of $9,965,000.00 (Exhibit 1005). The aggregate of the three loans was $39,882,000.00. All of the loans required payment of interest at the prime rate, and provided for an additional 5% above prime upon default. The notes were each secured by mortgages (Exhibits 1006 through 1009). Each mortgage contained an assignment of rents and leases. The Lender also recorded UCC financing statements (Exhibits 1013 through 1019). In addition, three separate limited guaranties were signed with respect to each note. Nadhir, Basim Binno and Jalal Shallal each signed a limited guaranty of each of the notes (Exhibits 1010 and 1012). The maturity date of each of the loans was October 1, 2006.

After refinancing with the Lender, the Debtors constructed the New Garage, continued the renovations to the Dime Building, and significantly increased the occupancy of the Dime Building. When the loans matured in October, 2006, the Debtors and the Lender agreed to extend their term for two years, until October 1, 2008 (Exhibit 1002). The Debtors made the regularly scheduled payments on the loans, but were unable to pay off the loans when they matured in October, 2008. The Debtors and the Lender negotiated regarding a possible extension, but were unable to come to an agreement. When the Debtors did not pay off the loans at the maturity date, the Lender began foreclosure proceedings. On March 5, 2009, the Lender issued and recorded statutory notices of default (Exhibits 1029 through 1032), with respect to the assignment of rents for the Dime Building, the Old Garage and the New Garage.

In response to the foreclosure proceedings, the Debtors filed suit against the Lender in Oakland County Circuit Court, asserting claims for fraud, rescission and injunctive relief. The Debtors moved for a preliminary injunction to stop the foreclosure proceedings. That motion was denied on April 30, 2009 by the Oakland County Circuit Court (Exhibit 1045). The Oakland County Circuit Court also granted the Lender a summary disposition of the Debtors' claims for fraud, rescission and injunctive relief (Exhibit 1044). On June 3, 2009, the Debtors each filed a voluntary petition for relief under Chapter 11. At the time that the Debtors filed their petitions, the Debtors and the Lender agree that the Debtors had made the interest payments through May, 2009 and that the outstanding balance of principal and interest owing on the loans to the Lender was

$36,592,482.95 (Exhibit 1036).  In addition, the Debtors and the Lender agree that there was approximately $550,000.00 of outstanding property taxes on that date.[2]

At the initial Chapter 11 status conference with the Court, the Debtors requested that the cases be jointly administered.  The Court granted the Debtors' request.  The Debtors also advised the Court that they wished to file a plan of reorganization very quickly, and asked the Court to set an accelerated schedule for consideration of the Debtors' disclosure statement and plan of reorganization.  The Court granted that request.  Although there are three separate Chapter 11 debtors, the Debtors filed a single combined joint plan of reorganization and disclosure statement on June 30, 2009 (docket entry no. 38).  On July 10, 2009, the Court granted the Debtors' request for preliminary approval of the disclosure statement and set a hearing on final approval of the disclosure statement and confirmation of the plan for August 31, 2009.

The Debtors' disclosure statement stated that the appraised fair market value of the properties was $24.5 million in June, 2008, but that the properties had "further declined in value since that time, consistent with market and economic conditions in the area."  The liquidation analysis that accompanied the disclosure statement showed the combined "market value" of the Dime Building, the Old Garage and the New Garage to be $20 million at the time the disclosure statement was filed. The plan proposed that the Debtors would retain the Dime Building, the Old Garage, and the New Garage.  The plan also proposed that Colossae, LLC would give back the vacant Olde Building to

---

[2]  The Debtors and the Lender stipulated to admit Exhibits 1053, 1063 and 1064 containing tax statements and correspondence regarding the outstanding pre-petition property taxes.  The figures set forth on these exhibits do not reconcile precisely with the parties' $550,000 estimate.  However, since the parties agreed that the outstanding property taxes approximated $550,000 on the petition date, the Court will use that figure.

Michigan Heritage Bank, the holder of the mortgage on that building. The plan contained six classes of claims and interests.

Class I consisted of the debt owed to the Lender, and provided that the debt would be "allocated" to a secured claim of $20 million, and the balance, estimated at $16.5 million, would be "allocated" to an unsecured claim. The plan proposed that both the secured and unsecured portions of the claim be paid with interest fixed at the prime rate published in the *Wall Street Journal* on the confirmation date. The plan further proposed that the Debtors would repay the secured portion of the Lender's claim with a 30-year amortization and a five-year maturity date, and would repay the unsecured portion of the Lender's claim with a 15-year amortization and a five-year maturity date. Also, the plan provided a mechanism for the Debtors, at their option, to obtain financing for tenant improvements for new leases from sources other than the Lender, secured by a first lien upon the rents generated by the new leases, despite the existing assignment of leases and rents already held by the Lender to secure its claims.

Class II consisted of the Michigan Heritage claim and provided for the Olde Building to be "returned" to Michigan Heritage. Class III consisted of secured claims other than the Lender and Michigan Heritage. Class IV consisted of all allowed general unsecured claims and was broken down further by a "convenience class" of allowed unsecured claims under $10,000.00. The plan provided for payment in cash in full of the allowed unsecured claims in the convenience class on the effective date of the plan. The plan provided that allowed general unsecured claims not in the convenience class would receive, at their option, either 30% of their claims in cash in one year, or 50% of their claims in 16 equal installments beginning one year after the effective date of the plan and continuing through the fourth anniversary of the effective date of the plan.

-6-

Classes V and VI addressed interest holders. Class V consisted of the equity interest of an investor, Detroit Property, L.P., defined in the plan as "Steinhardt." The plan proposed to convert the Class V interest of Steinhardt into a subordinated unsecured note for $1 million. Class VI consisted of all other equity interests. The plan proposed that the Class VI interest holders would retain their interests and would not be impaired. The plan also provided that all administrative expense claims would be paid in full on the effective date of the plan and that all pre-petition priority tax claims would be paid in full in equal installments over five years from the effective date of the plan. The plan did not provide for any new equity to be contributed to the Debtors, but did provide an option for the individual guarantors to contribute to the Debtors in the event that the Debtors missed a payment to the Lender. In such event, the individual guarantors could, at their option, each contribute on a pro-rata basis the amount needed to make up a payment missed by the Debtors, after receiving twenty business days' notice of the Debtors' payment default. The plan also provided that the Lender would be enjoined from taking any action against the individual guarantors with respect to the enforcement of their guaranties unless and until the individual guarantors declined to exercise their option to make their pro-rata share of a payment that the Debtors failed to make to the Lender. The plan further provided for the Debtors and the individual guarantors to retain all of their causes of action against the Lender, including those that had been brought in the Oakland County Circuit Court case. Finally, the plan provided for the substantive consolidation of all of the Debtors and their estates.

On August 24, 2009, the Lender filed extensive objections to confirmation (docket entry no. 115). In addition, the Lender filed a motion to lift the automatic stay in each of the three Chapter 11 cases.

On August 31, 2009, the Court held the confirmation hearing. On the morning of the hearing date, the Debtors filed an amended plan and disclosure statement (docket entry no. 128), which purported to respond to many of the Lender's objections. The Debtors urged the Court at the August 31, 2009 hearing to consider scheduling an evidentiary hearing because the Debtors believed that the Lender's objections raised disputed issues of fact. After hearing arguments of counsel on August 31, 2009, the Court determined to schedule an evidentiary hearing on confirmation beginning on November 4, 2009. The Court then granted the parties' request to conduct limited discovery on the factual issues to be addressed at the confirmation hearing. On September 3, 2009, the Court entered a pretrial order (docket entry no. 133) that set forth the discovery that each party could take. The pretrial order also required the parties to mediate the Lender's objections to confirmation and appointed a mediator. Ultimately, the mediation was not successful in resolving the Lender's objections to the plan.

A few days before the November 4, 2009 adjourned confirmation hearing, on October 30, 2009, the Debtors filed yet another amended plan ("third amended plan") (docket entry no. 228). The third amended plan drops a number of features to which the Lender had objected. The third amended plan still proposes to pay the Lender's $20 million Class I secured claim with a five-year maturity and a 30-year amortization, and to pay the Lender's $16.5 million Class I unsecured claim with a five-year maturity and a 15-year amortization. However, instead of using the prime rate of interest on the date of confirmation as a fixed rate of interest going forward, the Debtors' third amended plan calls for a floating rate of interest. The third amended plan provides that payments will be made monthly on both the secured portion of the Lender's claim and on the unsecured portion of the Lender's claim based upon the prime rate of interest as published by the *Wall Street*

*Journal*. The third amended plan also still contains the option for the Debtors to obtain financing for tenant improvements for new leases and secure that financing by a lien on the rents to be generated by the new leases, senior in priority to the Lender's assignment of leases and rents.

The third amended plan also still proposes to pay administrative expenses and convenience class unsecured claims in cash, in full at confirmation, and to pay the pre-petition property tax claims over five years, with interest. The third amended plan also still proposes to pay unsecured claims (other than the convenience class claims and the unsecured claim of the Lender) the same 30% cash in one year or 50% in installments. The third amended plan adds a new provision that states that the individual guarantors "shall" contribute a minimum of $200,000.00 for tenant improvements over the life of the third amended plan. However, two of the individual guarantors, Binno and Shallal, filed an objection (docket entry no. 243) to the third amended plan because they had not agreed to make such contributions. As a result, the Debtors entered into a stipulation with them on the record at the beginning of the confirmation hearing on November 4, 2009 that modifies the language in the third amended plan so that it now provides that the individual guarantors "may" contribute $200,000.00 for tenant improvements. The third amended plan therefore does not require any equity contributions, but it does still retain any causes of action that the Debtors may have against the Lender, including those causes of action set forth in the complaint that the Debtors filed in Oakland County Circuit Court. However, the third amended plan does eliminate the injunctive relief that the earlier plans had provided for the individual guarantors.

After the Debtors filed the third amended plan on October 30, 2009, just before the November 4, 2009 confirmation hearing, the Lender filed a brief (docket entry no. 240) on

-9-

November 2, 2009 objecting to the third amended plan. The Lender's objections to the third amended plan can be grouped into six categories.

First, the Lender objects because the prime rate of interest published in the *Wall Street Journal*, currently 3.25%, is not a sufficient interest rate for either the Lender's Class I secured claim or its Class I unsecured claim. According to the Lender, applicable case law authority requires the Court to adjust the prime rate upward by a significant amount to reflect the risk of nonpayment to the Lender by the Debtors. According to the Lender, a proper rate of interest in this case would exceed 10%.

Second, the Lender objects that the third amended plan is not feasible in numerous respects. The Lender asserts that the Debtors cannot make the cash payments to administrative expense claimants and the convenience class unsecured creditors at confirmation that are required by the third amended plan, because the only funds that the Debtors have with which to make such payments consist of $1,588,000.00 held in a lockbox by the Lender. Those funds represent the rents collected by the Debtors from the Dime Building and the garage during the Chapter 11 cases and are subject to a perfected assignment of rents in favor of the Lender. Therefore, the Lender asserts that those funds are not available to make the payments required by the third amended plan to administrative expense claimants and other classes of creditors that are junior in priority to the Lender. Even if the Debtors had the funds to enable them to make the cash payments required by the third amended plan at confirmation without using the Lender's cash collateral, the Lender asserts that the Debtors do not have the ability to make the monthly payments of principal and interest to the Lender required by the third amended plan if the Court requires the Debtors to pay a proper rate of interest instead of the prime rate of interest proposed by the Debtors' third amended plan. With a proper rate of

-10-

interest, the Lender asserts that the Debtors simply will not have enough cash flow to service the Lender's Class I claims on a monthly basis. The Lender's final feasibility objection is that the Debtors do not have evidence to show that they will be able to pay the balloon payment of both the Class I secured claim and the Class I unsecured claim in five years as required by the third amended plan.

Third, the Lender objects that the third amended plan is not fair and equitable. Because the Lender has voted to reject the third amended plan, § 1129(a)(8) of the Bankruptcy Code is not met with respect to Class I. Therefore, the third amended plan may only be confirmed if the Debtors can demonstrate that the third amended plan meets all of the requirements of § 1129(b) of the Bankruptcy Code, including the requirement that the third amended plan is fair and equitable with respect to the Lender's Class I claims. The Lender asserts that the third amended plan is not fair and equitable with respect to the Lender's Class I secured claim of $20 million under § 1129(b)(2)(A) of the Bankruptcy Code because, with interest paid only at the prime rate, the stream of payments on the Class I allowed secured claim of $20 million does not have a value equal to the value of the Lender's interest in the property securing such claim. In order to meet § 1129(b)(2)(A), the Lender asserts that the Debtors would have to pay an interest rate on the allowed secured claim in excess of 10%, which the Debtors' third amended plan does not do. The Lender similarly objects that the third amended plan is not fair and equitable with respect to the Lender's Class I unsecured claim of $16.5 million under § 1129(b)(2)(B) because, with interest paid only at the prime rate, the stream of payments on the Class I unsecured claim of $16.5 million does not have a value equal to the allowed amount of the Lender's unsecured claim. Moreover, because the risk of nonpayment of the Class I unsecured claim is even greater than the risk of nonpayment of the Class I secured claim, the

Lender asserts that the interest rate on the unsecured claim must be even higher than the interest rate on the secured claim.

The Lender also asserts that even if the Debtors paid a proper rate of interest, such that § 1129(b)(2)(A) and (B) could be met, the third amended plan is still not fair and equitable in a number of other respects. Specifically, the Lender asserts that the plan is not fair and equitable because it calls for the Debtors to take $1,588,000.00 in post-petition rents held by the Lender in a lockbox subject to an assignment of rents in favor of the Lender, and use those rents either to pay claims that are inferior to the Lender's claims or to make up cash flow shortages during the life of the third amended plan. In other words, the Debtors are using the Lender's cash collateral to pay administrative expenses, unsecured claims and operating cash flow deficits in this case without providing adequate protection of the Lender's interest in such cash collateral. Moreover, the third amended plan provides for a cash payment to administrative expense claims and the convenience class unsecured claims on the effective date of the third amended plan while deferring payment of the outstanding pre-petition priority property taxes owing on the Dime Building, the Old Garage and the New Garage for five years, despite the fact that the pre-petition priority property tax claims are secured by a lien on those properties that is senior to the Lender's lien. Finally, the Lender asserts that the third amended plan is not fair and equitable because it still allows the Debtors to retain causes of action and claims against the Lender while extending the maturity of the loans for five years before the Lender will be repaid.

Fourth, the Lender objects to the classification of claims in the third amended plan. The Lender asserts that it is not proper under § 1122(a) of the Bankruptcy Code for the Debtors to classify both the Lender's secured claim and its unsecured claim in Class I. The Lender asserts that

-12-

the Debtors improperly placed the Lender's unsecured claim in a separate class from other unsecured claims solely to gerrymander the classes in an effort to obtain an impaired class that accepts the Debtors' third amended plan to comply with § 1129(a)(10) of the Bankruptcy Code.

Fifth, the Lender objects that the Debtors have not proposed the third amended plan in good faith. Essentially, the Lender states that the Debtors filed the third amended plan solely to protect Nadhir from personal liability on his guaranty. The Lender argues that this is not a plan to save or reorganize a business, but it is instead a plan to hold on to a grossly undersecured building and garage for a long period of time in an unrealistic hope that they may one day be of sufficient value to repay the Lender in full, and avoid personal liability for the individual guarantors. According to the Lender, that is not a good faith plan.

Sixth, the Lender objects to the proposed substantive consolidation of the Debtors. The Lender argues that the Debtors offer no justification or grounds for substantive consolidation. The Lender suspects that the garage generates insufficient income to fund its operating expenses, and that the Debtors are requesting substantive consolidation to divert income from the Dime Building to pay for garage expenses.

### IV. Summary of Witnesses' Testimony and Other Evidence

The Debtors' first two witnesses were Nadhir and Louis Glazier. Nadhir testified concerning the history of the properties and the existing financing. Nadhir also testified as to facts relating to the Debtors' financial projections and the Debtors' ability to fund the third amended plan. Glazier is the Debtors' financial advisor, and is a certified public accountant and an attorney. He is a principal of Franklin Advisors LLC. Glazier testified that, in addition to providing financial advice

-13-

to the Debtors, he reviewed projections and other financial information that the Debtors used to propose their plan of reorganization.

Nadhir testified that he holds a masters degree in business administration and a securities license, that he has substantial retail business experience and that he had successfully developed and redeveloped commercial and other properties prior to the Debtors' purchase of the Dime Building and the Old Garage. Nadhir testified that he put together a group of investors to purchase the Dime Building and the Old Garage in 1999. The investors put in roughly $9 million of equity and $25 million of debt and completely renovated the Dime Building. Nadhir also testified that there were approximately $10 million of cost overruns in the renovation that were funded by the investors. According to Nadhir, the renovation was extensive, and entailed stripping the building interior, asbestos mediation, installing substantial safety measures, including a back up generator, and fiber optic wiring. Nadhir then testified to the history of the financing with GMAC and the refinancing with the Lender. Nadhir explained that by 2004, much of the tenant space had been built out and the Debtors wanted to expand the garage. The Debtors' refinancing with the Lender was for $39 million, of which approximately $36.5 million was drawn down and is outstanding. The $36.5 million retired the existing financing and provided funds for the construction of the New Garage.

Nadhir testified that the Debtors filed the Chapter 11 cases because of a number of factors. First, Nadhir noted that if the properties were given back to the Lender, there were three individual guarantors who would have extensive personal liability, including Nadhir. Second, the investors have invested over $20 million (Exhibit 2) in these properties that they did not want to lose. Third, even though the current appraisals show the value of the properties to be far less than the debt owed

-14-

to the Lender, that value is low because of the depressed economic climate and the "perfect storm" of negative market forces occurring at this time. Despite this, Nadhir testified that he believes that the Debtors' third amended plan is based upon realistic assumptions and attainable projections, and that the Debtors will be able to make all the payments required under the plan.

Glazier testified regarding several sets of projections prepared by or for the Debtors.[3] Nadhir prepared the first set of projections (Exhibit 1050), dated June 8, 2009. The Debtors filed a second set of projections (Exhibit 1051) with their combined plan and disclosure statement (docket entry no. 38). A third set of projections (Exhibit 1052), prepared by Glazier on October 1, 2009, made adjustments to the earlier projections based upon information provided to Glazier by Nadhir. Finally, a fourth set of projections (Exhibit 9) was also prepared by Glazier some time during October, 2009 in preparation for the confirmation hearing. Glazier testified that Exhibit 9 represents the most recent set of projections for the five years of the Debtors' third amended plan.

Glazier explained that he prepared Exhibit 9 by first revising Nadhir's one year projection for the calendar year 2010 to reflect "tweaks" to both the revenue side and the expense side of Nadhir's projections. Those "tweaks" are reflected in a separate exhibit, Exhibit 8, which covers only 2010. Although he did not himself audit either the Debtors' historical income or expense line items, and he acknowledged that he is not a forensic accountant, Glazier testified that he believed the one year projection for 2010 in Exhibit 8 to be a very reasonable projection. Glazier explained that under this projection, the Debtors' total operating income for the calendar year 2010 would be $6,134,818.00 and the Debtors' operating expenses for 2010 would be $2,641,114.00. The net

---

[3] The Debtor's first three sets of projections were marked as Lender's exhibits but were used by the Debtors' counsel during Glazier's direct examination.

operating income reflected on Exhibit 8 for calendar year 2010 is the difference of $3,493,704.00. Glazier then reduced the net operating income by non-operating expense line items aggregating $267,945.00. That leaves a balance of cash flow on Exhibit 8 of $3,225,759.00 for the calendar year 2010. However, Glazier also explained that the Debtors' largest tenant, Ameriprise, is contractually entitled to take a recoupment against the rent that it pays to the Debtors for the space that it occupies in the Dime Building based upon a separate transaction between Ameriprise and the Debtors. The amount of Ameriprise's recoupment for 2010 is $723,259.00. Therefore, Glazier deducted that sum from the Debtors' cash flow for 2010, leaving a balance of cash flow before debt service for 2010 of $2,502,500.00.

Glazier's revised projection for 2010 contained in Exhibit 8 is the foundation for the Debtors' projections over the five year life of the third amended plan set forth in Exhibit 9. Beginning with a cash flow before debt service of $2,502,500.00 for the year 2010, Glazier performed a calculation in Exhibit 9 to show what the payments would be to the Lender if the third amended plan was confirmed. Although the third amended plan provides for a floating rate of interest tied to the prime rate of interest, the calculation on Exhibit 9 assumes a constant interest rate of 3.25% for 2010. For the Class I secured portion of the Lender's claim, Exhibit 9 shows that the required payments to the Lender during 2010 at an interest rate of 3.25% and a 30-year amortization would total $1,046,000.00. For the Class I unsecured portion of the Lender's claim, Glazier's Exhibit 9 shows that the required payments to the Lender during 2010 at an interest rate of 3.25% and a 15-year amortization would total $1,380,000.00. Therefore, according to Glazier's calculations on Exhibit 9, the total debt service required to be paid to the Lender during the year 2010 if the third amended plan is confirmed would be $2,426,000.00. With a cash flow before

-16-

debt service of $2,502,500.00, and required payments under the third amended plan to the Lender of $2,426,000.00, Exhibit 9 shows a positive cash flow for the Debtors of $76,500.00 in 2010, the first year of the third amended plan.

Glazier then explained that the Debtors' net cash flow would become greater in each of the subsequent years of the third amended plan for several reasons. First, Glazier assumed that approximately 40,000 square feet of vacant but already finished space would be leased during 2011, thereby creating additional revenue. Second, Glazier's Exhibit 9 shows Ameriprise's recoupment for 2011 will be reduced to $602,716.00. The recoupment will no longer be required to be paid to Ameriprise at all beginning in the year 2012 and, therefore, the net cash flow of the Debtors increases significantly in the year 2012 and thereafter. Because of those facts, Glazier testified that he believed the Debtors will be able to make the monthly payments to the Lender under the third amended plan beginning after confirmation up to the maturity date in five years.

Glazier also explained that if the Debtors made all of the monthly payments of principal and interest to the Lender under the third amended plan, the remaining combined balance owing by the Debtors to the Lender at the end of five years on the secured portion and the unsecured portion of the Lender's claim would be $30 million. Glazier testified that he believed the Debtors will have the ability to pay the $30 million balloon payment to the Lender at the end of the five year period set forth in the third amended plan. Glazier acknowledged that he is not a real estate appraiser, but he felt confident that there will be opportunities for a sale or refinancing of the properties at the end of five years sufficient to enable the Debtors to make the $30 million balloon payment. In sum, Glazier testified that he believed the Debtors' projections to be realistic and the Debtors' third amended plan to be feasible.

On cross examination, Glazier was asked about the ability of the Debtors to make payments after confirmation to other classes of creditors under the third amended plan. Glazier testified that the Debtors presently have approximately $1.2 million of cash on hand and that this sum goes up each month as rents are collected. After payment of professional fees, other administrative expenses and other plan payments, Glazier estimated that the Debtors would still have approximately $1 million of cash on hand on January 1, 2010. Glazier explained that he used that $1 million as the "beginning cash" on the cash flow projection (Exhibits 13 and 15) that he prepared for the Debtors. However, on further cross examination, Glazier estimated the Debtors' professional fees at $500,000.00 and did not have an estimate of the amount that would be required to be paid by the Debtors to unsecured creditors. Further, Glazier acknowledged that the cash on hand held by the Debtors consists solely of rents collected during the bankruptcy case that are held by the Lender in a lockbox and are subject to a properly perfected assignment of rents held by the Lender. Glazier admitted that the Debtors' net positive cash flow of $76,500.00 that he projected on Exhibit 9 for the calendar year 2010 would not be sufficient by itself to pay professional fees, administrative expenses and other classes of creditors under the third amended plan without the use of the rents collected during the bankruptcy case to make such payments.

Nadhir also testified extensively about Exhibits 8 and 9. Nadhir testified that he was confident that the revised projections set forth on Exhibit 8 for the year 2010 were accurate, and that he was confident about the Debtors' ability to make the payments under the third amended plan. Nadhir testified that the projections for the five years assume that the existing tenants will continue to stay in place for the duration of their leases of existing space. He also testified that his management company, BOSC, had previously leased the executive office suites on the eighth floor

-18-

of the Dime Building and used them to sublease conference rooms and office facilities to subtenants as an "incubator" for possible new tenants. The stated rent in the BOSC lease was $21,000.00 per month, but Nadhir admitted that BOSC has never paid that amount. He also explained that once the Lender began foreclosure proceedings, Nadhir formed a new related entity to take over that space from BOSC. The new related entity has not paid any rent to the Debtors. Nadhir's new related entity occupying the executive suites does collect rents from subtenants, but does not remit them to the Debtors or into the Debtors' lockbox with the Lender. Nadhir stated that beginning in January, 2010, he intends to have this new related entity pay $7,500.00 per month to rent the executive suites on the eighth floor.

Nadhir testified about the existing leases in the Dime Building, the prospects for renewal of those leases and the prospects for obtaining new tenants. Nadhir testified that the existing tenants are satisfied with the Dime Building's management and are likely to renew their leases. He testified that he was currently negotiating with several potential new tenants, and described some of the correspondence in Exhibit 11 concerning those negotiations. Nadhir further testified that he believes the value of the properties to be in the $30 million vicinity, although he conceded that the Lender's appraisal shows the value of the properties to be only $16.1 million, and that the Debtors' own third amended plan states that the Lender's secured claim would only be for $20 million. Nadhir explained that the reason why the third amended plan provides for a secured claim of only $20 million for the Lender was because the Debtors "had heard" that the Lender estimated the value of the properties at $20 million and the Debtors did not want to dispute that estimate.

Nadhir also acknowledged that he had agreed to change the language in the third amended plan regarding contributions by the individual guarantors for tenant improvements up to

$200,000.00. Instead of requiring the individual guarantors to contribute up to $200,000.00 in tenant improvements by the use of the word "shall," the third amended plan has now been changed to state that the individual guarantors "may" contribute funds up to $200,000.00 for tenant improvements. Nadhir testified that he personally intended to make his share of the contribution if the third amended plan is approved. Nadhir also testified that if the third amended plan is confirmed, the Debtors will dismiss the lawsuit in Oakland County Circuit Court against the Lender, even though the third amended plan does not state that the lawsuit will be dismissed but instead preserves the lawsuit against the Lender post-confirmation.

Nadhir was also asked several questions regarding the cash needs of the Debtors at confirmation. Nadhir testified that the Debtors previously estimated $400,000.00 to $500,000.00 of cash payments that they would need to make at confirmation. On further examination, he admitted that in their answers to interrogatories, the Debtors had actually estimated the amount at $625,000.00. When asked on cross examination about the amount of professional fees that the Debtors had to pay, Nadhir testified that he did not recall. However, upon reviewing the Debtors' answers to interrogatories, Nadhir conceded that approximately 30 days before the confirmation hearing, the Debtors had estimated that they would need to pay $625,000.00 in cash at confirmation, including estimated professional fees of $350,000.00. When asked about Glazier's higher estimate of $500,000.00 of professional fees, Nadhir did not dispute that figure. Nadhir also admitted that at the time that the bankruptcy case was filed, there was $550,000.00 in pre-petition property taxes outstanding that the third amended plan proposes to pay over five years.

Michael Maher testified for the Debtors as an expert witness regarding banking practices and interest rates. Maher is a certified public accountant, and is currently president and chief executive

officer of Paramount Bancorp, Inc. Maher first explained what an efficient credit market is. According to Maher, an efficient credit market is one in which there are a number of competing lenders seeking credit transactions. Maher next described the volume of lending transactions today as very low compared to historical norms. He stated that there is no efficient credit market in place today, either locally or nationally, because of a number of factors, including the national troubles experienced in the financial services industry and a difficult regulatory environment.

Maher was then asked a series of questions on direct examination about approaches to interest rates discussed by the United States Supreme Court in its decision in <u>Till v. SCS Credit Corp.</u>, 541 U.S. 465 (2004). Maher testified that he had read the <u>Till</u> decision, and was familiar with the formula approach that the Supreme Court suggested be used in the absence of an efficient credit market. After testifying that there is no efficient market to determine interest rates for loans on commercial real estate in Detroit, Maher discussed the application of the formula approach to interest rates in this case. Maher stated that he reviewed the Debtors' projections, the third amended plan of reorganization, and certain appraisals provided to him in connection with this case. Maher testified that he assumed that the projections were accurate. Based on those projections, in his view, there is no risk to the Lender in this case. Maher then testified that in his opinion, under the formula approach, an appropriate rate of interest for the Debtors to pay the Lender under the third amended plan of reorganization is in the range of prime to prime plus 1%.

On cross examination, Maher acknowledged that he has never previously given an opinion regarding the appropriate cramdown rate of interest in connection with a Chapter 11 plan of reorganization. He admitted that he did not perform any independent analysis of the Debtors' projections, nor any forensic accounting. Nor did Maher review the leases for the Dime Building,

nor inspect the Dime Building and the garage. Maher also acknowledged that during his time as president of Paramount Bancorp in the last five months, the bank has made commercial real estate loans of office buildings with initial interest rates in the range of 6 to 6-1/2%, although he pointed out that Paramount Bancorp is no longer making any commercial real estate loans because of the strain on the bank's overall capital structure.

Although Maher testified that he was aware that the formula approach in <u>Till</u> suggested that risk adjustments be made for various factors, including the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan, Maher did not individually break down each of these factors. Maher concluded that a 1% overall risk adjustment to the prime rate was appropriate. Maher did note that ordinarily there is a greater risk of nonpayment of unsecured debt than there is with respect to payment of secured debt. However, Maher explained that in this case he looked at the entire transaction between the Debtors and the Lender as a single transaction, rather than as a secured claim and an unsecured claim. Therefore, he did not differentiate between the risk associated with nonpayment of the secured claim to the Lender and the risk associated with nonpayment of the unsecured claim to the Lender.

In sum, Maher has extensive experience in the banking industry and lending transactions, but his opinion that an overall risk adjustment of 1% should be applied under the formula approach in this case was conclusory in nature. He did not separately evaluate risk adjustments to be made for the circumstances in this case, the secured and the unsecured portions of the Lender's claims, the nature of the security for the Lender, and the duration and feasibility of the third amended plan.

The Debtors' next expert witness was Mitchell Kahn. Kahn is a certified public accountant, attorney and licensed real estate broker. Through his former company, Hilco Real Estate, and his

present company, Badger Real Estate Advisors, he is heavily involved in real estate restructurings, and an expert in that field. Kahn's testimony focused on three areas. The first and most extensive area of his testimony concerned the Debtors' projections. Kahn explained that he spent a "fair amount of time" with Nadhir and Glazier reviewing projections of income and expenses, and assisted in making adjustments to them. Kahn testified that he is very "comfortable" with the Debtors' projections contained in Exhibit 9, and that there is an "extremely high likelihood" that the Debtors will be able to make all of the payments required by the third amended plan.

The second area of Kahn's testimony concerned whether or not there are loans available in the market at this time for the Debtors' properties. Kahn testified that the lending industry today as a whole is at a standstill, and that commercial lending available today is "almost zero." Kahn also explained that the Detroit market has "more than its fair share of challenges." Kahn then explained that he or members of his staff contacted 19 different lenders to inquire about a loan for the Debtors' properties, but received no interest from any of these lenders.

The third area of Kahn's testimony pertained to the balloon payment that the third amended plan requires the Debtors to make to the Lender at the end of five years. If the Debtors make all of the payments to the Lender under the third amended plan in years one through five, then the balloon payment, according to Kahn, will be approximately $30 million at the end of the third amended plan. Although he himself is not a licensed real estate appraiser, Kahn testified that the "likely way" for the Debtors to make the $30 million balloon payment is either by a sale or refinance of the Dime Building and garage at the end of the five years. According to Kahn, whether a sale or refinance of the properties at that time will produce sufficient proceeds to make the balloon payment will be determined by the value of the properties at that time, and the application of a capitalization rate at

that time. Kahn did not offer an opinion as to either the value of the properties in five years or a projected capitalization rate at that time, although he did testify that capitalization rates are presently at an all-time high, and that he expects them to return to a "normalized range" over the next several years.

In sum, Kahn impressed the Court as very knowledgeable about real estate restructurings and plan feasibility issues. However, his testimony concerning the reliability of the Debtors' projections depended heavily upon the accuracy of the assumptions that Nadhir and Glazier made in those projections. On cross examination, Kahn acknowledged that he did not conduct an audit of the Debtors' income or expense line items, but that he would do so if he were a buyer of the properties. His testimony about the likelihood of the Debtors making the payments over the next five years admittedly did not consider any change in the interest rate to be paid to the Lender. Kahn acknowledged that he is not an expert in predicting interest rates. Kahn's testimony was also not probative of the Debtors' ability to make the cash payments required by the third amended plan on confirmation. Further, Kahn's testimony about the Debtors' ability to make the balloon payment of $30 million in five years under the third amended plan was speculative in nature. Since Kahn testified that he was not a real estate appraiser, he did not offer an opinion of the value of the Debtors' properties in five years, and did not opine what capitalization rate would be applied to the Debtors' net operating income in five years after confirmation of the third amended plan.

The Debtors also called Antonio Doblas-Madrid as an expert witness. Doblas-Madrid is an assistant professor and expert in macroeconomics. His testimony focused on macroeconomic theories and, specifically, on theories regarding speculative bubbles and their effect on boom-and-bust cycles. Doblas-Madrid explained that in the macroeconomics field, the speculative bubble

-24-

theory rejects the efficient market hypothesis that considers price to be an accurate reflection of an asset's value. Doblas-Madrid testified that if a bubble exists, then the price of an asset does not accurately reflect the fundamental or intrinsic value of the asset, but either exceeds or is below that value. Doblas-Madrid explained that speculative bubble theories are now relatively mainstream in the field of macroeconomics.

Doblas-Madrid testified that there was recently a speculative bubble in commercial and residential properties nationally, even though the Detroit area did not experience that bubble. Nonetheless, Doblas-Madrid testified that once the national real estate bubble burst, it did have an effect upon Detroit as well. According to Doblas-Madrid, the prices of both commercial and residential real properties dramatically declined below their fundamental or intrinsic value. Doblas-Madrid believes that the prices for commercial and residential real properties are, as a result of the bursting bubble and other market forces, presently less than the fundamental or intrinsic value of such properties.

Doblas-Madrid acknowledged that his testimony was largely on a macroeconomic level. He acknowledged that he is not an appraiser, and has never performed a valuation of commercial property, nor has he been trained to perform a valuation of commercial property. As a result, he did not offer an opinion of the value of the Dime Building and the garage today, or in the future. He also noted that there is no index for Detroit commercial property and, therefore, his research consisted largely of the examination of residential properties. Although Doblas-Madrid is certainly knowledgeable about macroeconomics, his testimony was not especially probative regarding the value of the Dime Building and the garage or the ability of the Debtors to make the required payments under the third amended plan.

The Lender countered with four expert witnesses of its own. The Lender's witnesses testified about the leasing environment in the downtown Detroit central business district, interest rates for Chapter 11 commercial real estate reorganizations, the value of the Dime Building and garage, and the Debtors' projections of revenues and expenses. The Lender's first witness was Salvatore Munaco. Munaco is employed by Signature Associates as a leasing agent. He is a lawyer and an office broker who has more than 20 years of experience in representing tenants and landlords concerning leases for offices in the Detroit metropolitan area, and especially in downtown Detroit. Munaco is an expert in leasing in the metropolitan Detroit office market.

In preparation for his testimony, Munaco reviewed appraisals and reports, and testified that he is very familiar with the Dime Building as well as other office buildings in the downtown Detroit central business district. Munaco has visited the Dime Building on many occasions. His testimony focused on whether or not it was likely that the Debtors could retain existing tenants, attract new tenants and improve upon the occupancy rate for the Dime Building.

Munaco described the Dime Building as a Class B+ building. He observed that the owners have done an excellent job with the improvements on the building. However, he also noted that the building was built in 1912 and has a u-shaped floor plate that can make it difficult to attract larger tenants. Munaco stated that the present occupancy rate for the Dime Building is 57 to 58%.

Munaco then testified that there is a tremendous oversupply of both Class A and Class B office space in the Detroit metropolitan leasing market and in downtown Detroit, in particular. Presently, Munaco estimates the vacancy rate for Class A office buildings in downtown Detroit at 22%, and for Class B office buildings at 30%. With an occupancy rate of only 57 and 58%, the Dime Building's vacancy rate is 42 to 43%. Munaco found this considerably higher than the rates

-26-

for Class A and B office buildings. Munaco observed that the downtown Detroit office market currently has a supply that greatly exceeds the demand. Munaco expects that situation to continue and even worsen because of the job reductions, office closings, layoffs and high unemployment rate in Detroit. Munaco testified that there will likely be an even greater oversupply of Class A and Class B office space in downtown Detroit going forward than today. As a result of this glut of office supply, Munaco observed that landlords for Class A and Class B office buildings are increasingly competitive, and are lowering rental rates and increasing tenant improvement allowances, making it an extremely competitive environment.

Munaco reviewed the Debtors' projections and commented on several of their assumptions. First, he did not consider it realistic for the Debtors to assume that an additional 40,000 square feet of space in the Dime Building will be leased over the next five years. Munaco considered the Debtors' projections of 75% occupancy in the next four years to be very unrealistic. Second, although he did consider the Debtors' projected rental rate of $15.00 per square foot as reasonable, he did not consider the Debtors' projected allowance of $5.00 per square foot for tenant improvements as being realistic. On balance, he considered the Debtors' assumptions regarding their ability to retain the Dime Building's existing tenants and attract new tenants as being overly optimistic.

Munaco displayed great familiarity with the downtown Detroit office leasing market. His description of the market as having far more supply than demand, and one which he expects to become worse based upon continued layoffs, business closings, and continued unemployment, was powerful. His testimony left the Court with a very bleak picture of the leasing market for office space in downtown Detroit for the foreseeable future.

-27-

The Lender's second witness was Richard W. Ferrell. Ferrell is a real estate financial consultant with several decades of in-depth experience in real estate development and real estate finance. He has a long list of qualifications and experience in real estate restructurings, real estate underwriting, real estate finance, and real estate Chapter 11 reorganizations. Ferrell is an expert in plan of reorganization interest rates, commercial real estate loan underwriting, and plan feasibility. In this case, he reviewed the Debtors' various plans, the Lender's objections to them, rent rolls, appraisals, leases, other expert witness reports, various publications, and undertook a tour of the properties themselves. The Lender elicited testimony from Ferrell on both the interest rate proposed in the Debtors' third amended plan and feasibility of the third amended plan.

First, Ferrell testified regarding the interest rate proposed by the Debtors. As a starting point, Ferrell described current underwriting standards used in the making of commercial real estate loans secured by office buildings. Noting that underwriting criteria today are tighter than they have been for some time, Ferrell observed that among the underwriting criteria relied upon by lenders today are loan-to-value ratios in the range of 60%, net operating income debt service coverage of 1.3, strong personal guaranties, and high physical occupancy of the subject building. Ferrell testified that the current market rate of interest for commercial real estate loans for office buildings that meet these underwriting criteria is between 6 to 7%. Ferrell then described the market for non-conforming loans, such as mezzanine loans, that are more risky in nature. Ferrell testified that market rates for those types of loans is in the range of 15 to 18%. Typically, these types of non-conforming loans, such as mezzanine financing, are junior to conventional first mortgage loans.

Ferrell testified that there are few commercial real estate loans being made for office buildings in the Detroit metropolitan area at this time. He described the area as one that is perceived

-28-

by lenders as a troubled market, where the properties do not meet the traditional underwriting criteria that he described earlier. As a result, few lenders are making loans in this market at this time.

Although he acknowledged that few commercial real estate loans are being made nationally, and even fewer in the Detroit metropolitan area, Ferrell considers the credit market to be acting efficiently. In Ferrell's view, this is because, contrary to recent times, the market is now pricing commercial real estate loans in relationship to their risk. Because risk is now being appropriately priced, the credit market is operating efficiently, even though the result is a scarcity of commercial loans.

Because few commercial real estate loans are being made today as a result of the risk in making such loans, Ferrell was asked about the formula approach adopted by the Supreme Court in Till. Whether one assumes that there is no efficient credit market or that, even if there is an efficient market, no loan is available in that market for the Debtors' properties, Ferrell explained how the formula approach would determine an appropriate interest rate in this case. Ferrell noted that the Till analysis begins by looking at the national prime rate of interest, then making adjustments for risk. Ferrell then separately considered each of the risk factors identified in Till.

First, Ferrell added 2% to reflect the risk that exists in the circumstances of this case. Among the circumstances that Ferrell identified is the fact that there is no cash in the estate for the ongoing development of the Dime Building. If the Dime Building needs cash for tenant alterations, Ferrell noted that the third amended plan does not provide a source for that cash. The third amended plan does not require any contribution from any of the holders of an equity interest in the Debtors. Ferrell conceded that the third amended plan does have a mechanism for the Debtors, at their option, to

obtain financing from sources other than the Lender, to somehow be secured by rents generated from

new leases. But he did not consider that mechanism to be workable because the Lender already

holds a first mortgage and a perfected assignment of rents and leases. Ferrell testified that

underwriters look to see whether there is a commitment for funding tenant improvements and leasing

commissions in considering the circumstances of a particular loan, and noted that in this case there

is none. Another circumstance of this case that led Ferrell to add a 2% risk adjustment is the fact

that the personal guaranties made by the individual guarantors each have a cap upon them and are

not unlimited or joint and several.

Ferrell then added another 2% risk adjustment to reflect the nature of the security in this

case. The reason for this adjustment is because the Dime Building is an older building, with a

u-shaped floor plate, making it difficult to attract larger tenants. More importantly, in considering

the nature of the security, Ferrell pointed out that a walk through the Dime Building shows that the

refurbishment is unfinished, with five floors of raw space (floors 12-16) that have not been

improved. That raw space cannot be leased to tenants without substantial improvement. Because

the Dime Building is only partially renovated and without the funds to complete the renovation,

Ferrell thought a 2% risk adjustment for the nature of the security to be appropriate.

Ferrell explained that he made no risk adjustment for the duration of the third amended plan

because he does not consider five years to be too long of a duration. Rather, it is a duration that is

consistent with industry custom for the term for commercial real estate loans secured by office

buildings.

Ferrell next added a 3% risk adjustment to reflect his belief that there is substantial risk in

the feasibility of the Debtors' third amended plan. Ferrell does not believe that the third amended

-30-

plan generates sufficient cash flow to service the debt owing to the Lender. He considers the Debtors' leasing assumptions and projected cash flows overly optimistic, especially when compared to those projections prepared by independent appraisers that were contained in the appraisals of the Dime Building that Ferrell examined. He also noted a number of other facts that led him to consider the feasibility of the third amended plan to be risky. The most significant of those is the risk of the Debtors' failure to make the balloon payment at the end of the five years. In order to successfully exit and complete the third amended plan, Ferrell explained that the Debtors will need a significant increase in the value of the Debtors' properties that can only occur if there is a substantial drop in capitalization rates, coupled with a robust leasing market. Ferrell was not persuaded that it is reasonable or realistic to project that both of those circumstances will occur at the end of five years to enable the Debtors to sell or refinance their properties, in light of the depressed market for commercial real estate in Detroit, and the expectation that the market is likely to continue to decline.

After reviewing each of the factors identified in Till, Ferrell's conclusion was that the formula approach dictates a 7% adjustment to the prime rate for risk and, therefore, an interest rate in this case of 10 to 10-1/2% for the secured portion of the claim of the Lender. As to the unsecured portion, Ferrell concluded that the risk of nonpayment is significantly greater, and that the unsecured portion more closely resembles mezzanine or equity financing than a secured loan for purposes of the formula approach.

After performing the formula approach and arriving at an interest rate of 10 to 10-1/2%, Ferrell then looked for benchmarks as points of comparison to test his results. One such benchmark is the expected rate of return on other commercial real estate transactions. Ferrell testified that a purchaser of a AAA-rated bond, secured by a pool of loans having a debt service coverage ratio of

2 or more, would ordinarily obtain a yield of 9 to 9-1/2%. That is a far less risky investment, and that point of comparison supported Ferrell's view that 10 to 10-1/2% is not unreasonably high in this case. As another point of comparison, Ferrell testified regarding his familiarity with other Chapter 11 real estate reorganizations in which debtor-in-possession financing is available in the range of 12 to 13%, again supporting his view that 10 to 10-1/2% is not an unreasonably high interest rate in this case.

After concluding that an appropriate interest rate under the formula approach in this case is 10 to 10-1/2%, Ferrell testified regarding the feasibility of the Debtors' third amended plan. Overall, he had already observed that a number of the Debtors' assumptions were overly optimistic. However, the focus of Ferrell's feasibility testimony now turned to the Debtors' assumption that a 3.25% rate, which is the present prime rate of interest, is likely to remain static over the course of the third amended plan. Even though the Debtors' third amended plan does not provide a fixed rate of interest, and instead is based upon a floating prime rate of interest, all of the Debtors' projections assume a rate of interest of 3.25% for the life of the third amended plan (Exhibits 9, 13 and 15). Ferrell testified that this is an unsupportable assumption. Ferrell testified that the prime rate of interest is presently at a historical low (Exhibit 1056). He also testified that well recognized financial industry publications project that the prime rate of interest will increase significantly during the five year term of the third amended plan.

One of the publications relied upon by Ferrell is the Blue Chip Financial Forecast. The Blue Chip Financial Forecast dated June 1, 2009 (Exhibit 1066) assembled various financial industry data and indicators of interest rates in the United States for various types of funds, commercial paper, LIBOR, prime rate and treasury notes. The publication surveyed an extensive list of financial

institutions in the United States, including banks, rating agencies, investment institutions, capital management funds and academic institutions and compiled this information in detail. Ferrell noted that the Blue Chip Financial Forecast contains a compilation of projected changes in the prime rate of interest during the next five years. The consensus shown in the Blue Chip Financial Forecast reflects that the prime rate is projected to increase annually during each year of the life of the third amended plan. In the years 2011 through 2014, the last four years of the Debtors' third amended plan, the consensus is that the prime rate will increase to: 5.3% in 2011; 6.2% in 2012; 6.8% in 2013; and 7.1% in 2014. The Blue Chip Financial Forecast report also sets forth a "top ten" and a "bottom ten" of the various projections. Even if the average of the "bottom ten" predictors are utilized, the prime rate is still projected to increase to: 3.8% in 2011; 4.7% in 2012; 5.5% in 2013; and 5.9% in 2014. Even if one throws out the "top ten" average and uses either the consensus average or the "bottom ten" average, the point remains the same: the prime rate of interest is projected to increase in each year over the life of the Debtors' third amended plan. Ferrell testified that an appropriate formula approach risk adjustment of 7%, when added to the projected prime rate of interest in each year of the life of the Debtors' third amended plan, makes the plan infeasible.

Ferrell's opinions were supported by extensive experience and research. He has testified numerous times with respect to interest rates and feasibility, including in a number of large and complex Chapter 11 real estate reorganizations. Of the experts that testified in this case, he had the best and most detailed handle on the types of risks that lenders look at when underwriting a commercial loan on an office building. Ferrell was able to quantify those risks into specific

adjustments for application to the <u>Till</u> formula approach.  His testimony on the appropriate interest rate and on the lack of feasibility of the Debtors' third amended plan was persuasive.[4]

The Lender next called Ilya Barskiy as its third expert witness.  Barskiy is a senior appraiser at CB Richard Ellis.  He has extensive experience as a credit analyst and an underwriter.  He is a certified general real estate appraiser licensed by the State of Michigan and an associate member of the Appraisal Institute.  He has appraised numerous office buildings, including downtown Detroit office buildings such as the Penobscot Building, Stroh Riverplace, One Kennedy Square, One Woodward, and others.  He is an expert with respect to real estate appraisals of office buildings in downtown Detroit and its suburbs.

Barskiy testified that he was asked to provide an appraisal of the value of the Debtors' properties on two separate dates: October 2, 2009, and October 2, 2014.  Barskiy testified that the October 2, 2009 appraisal resulted in a market value of $8 million for the Dime Building and $8.1 million for the garage.  Therefore, Barskiy opined that the total market value of the Debtors' properties as of October 2, 2009 is $16.1 million.

Barskiy then offered an opinion as to the value of the Dime Building and the garage as of October 2, 2014, the maturity date of the Lender's claims under the Debtors' third amended plan.  Barskiy estimated the market value of the Dime Building on that date would be $7,400,000.00, and the market value of the garage on that date would be $7,850,000.00, for a combined estimated value of the Debtors' properties on that date of $15,250,000.00.

---

[4] Although Ferrell issued a written report of his expert opinions in this case, it was not introduced into evidence, although the Debtors introduced into evidence an unsigned earlier draft of Ferrell's report (Exhibit 1031) during their cross examination of Ferrell.

Barskiy then explained his methodology in rendering each of these opinions. Barskiy testified that he analyzed the Debtors' properties, their location, market conditions, and various public records. He also examined leases, financial statements and rent rolls. Finally, he conducted a physical inspection of the properties. He observed that the floor plan for the Dime Building is not the most functional, because work spaces are not convenient to one another because of the u-shaped floor plate. Barskiy felt that this feature of the Dime Building made it more difficult to attract tenants. Barskiy also explained that he spoke to brokers about market conditions, and that he believes that, at present, the market for downtown Detroit office space is greatly oversupplied and that occupancy rates continue to deteriorate. Barskiy also testified that he reviewed the Ameriprise lease and noted that there were two peculiar items about the Debtors' relationship with Ameriprise. One peculiarity is the recoupment agreement that allows Ameriprise to recoup substantial sums owed by the Debtors to Ameriprise against the rent that Ameriprise pays for the Dime Building. Second, Barskiy testified that the Ameriprise lease contains a termination provision that allows Ameriprise to turn back all of its space on September 30, 2014, subject only to the payment of a termination price. Barskiy explained how he took the Ameriprise lease into consideration in rendering opinions of value, and observed that the effect of Ameriprise exercising its termination option in 2014 would impact the value of the Dime Building by approximately $1 million.

Barskiy then testified to various approaches for appraising real estate, including the cost approach, sales comparables approach, and the income capitalization approach. Barskiy explained why he considers the income capitalization approach to be the most reliable, and the sales comparables approach to be the next most reliable. Barskiy explained that when applying the income capitalization approach, the most preferable approach is a direct capitalization approach,

based upon stabilized income. When income is not stabilized, Barskiy explained that he utilizes a discounted cash flow approach. For the Dime Building, Barskiy testified that he used the discounted cash flow approach because the income is not stabilized. Barskiy next described the assumptions that he made in performing a discounted cash flow analysis. Barskiy assumed a market rate of rent of $15.00 per square foot for the office portion of the Dime Building, $20.00 per square foot for the retail portion of the Dime Building, $15.00 per square foot for tenant improvements for new office space, $5.00 per square foot for renewal of office space, and $30.00 per square foot for tenant improvements for the five floors that make up the rough shell, unfinished portion of the building. After making these assumptions, Barskiy then performed a discounted cash flow analysis with a discount rate of 14%. That calculation produced a value of $8.4 million for the Dime Building. Barskiy tested that approach by a sales comparison approach. After considering the sales comparison approach, Barskiy arrived at a market value of the Dime Building on October 2, 2009 of $8 million.

Barskiy used a similar, but not identical, approach for the parking garage. Because the parking garage has a stabilized income, Barskiy used an income capitalization approach. He also observed that purchasers of garages typically utilize an income capitalization approach. In applying the income capitalization approach, Barskiy used a capitalization rate of 10.5% after looking at all of the income and expenses of the garage, which produced a market value of $8,050,000.00 for the garage as of October 2, 2009. To test this value, Barskiy then turned to national sales comparables. Ultimately, Barskiy concluded that the market value of the garage is $8.1 million as of October 2, 2009.

The appraisal performed by Barskiy as of October 2, 2009 was not the first appraisal that he had performed of the Debtors' properties. During cross examination of Barskiy, an appraisal of the Debtors' properties dated December 18, 2007 (Exhibit 4) was introduced into evidence. This appraisal was also prepared by CB Richard Ellis and signed by Barskiy. It appraised the Dime Building and the garage as having a total value of $24,750,000.00 as of November 27, 2007. A copy of the written appraisal performed by Barskiy as of October 2, 2009 (Exhibit 7) was then introduced into evidence during Barskiy's cross examination. The October 2, 2009 appraisal was consistent with the testimony provided by Barskiy during the trial. Barskiy was asked to explain the differences between the earlier appraisal, and the more recent appraisal he had performed as of October 2, 2009. Barskiy explained that the differences in value between the December 18, 2007 appraisal, which showed a combined value of $24,750,000.00, and the October 2, 2009 appraisal, which showed a combined value of $16.1 million, were due primarily to two factors. First, the earlier appraisal did not take into consideration the recoupment agreement with Ameriprise, thereby resulting in a higher value for the December 18, 2007 appraisal than for the October 2, 2009 appraisal. Second, and more important, the October 2, 2009 appraisal was based upon the use of a significantly higher capitalization rate than the December 18, 2007 appraisal. Barskiy explained that the reason for this was due to the fact that current sales comparables identified in the October 2, 2009 appraisal had utilized much higher capitalization rates than the sales comparables identified in the December 18, 2007 appraisal. Barskiy therefore used a similar capitalization rate in his October 2, 2009 appraisal, although not as high as the capitalization rate used in some of the more recent sales comparables. Barskiy's explanation for the higher capitalization rate in the October 2, 2009 opinion was credible and well supported.

-37-

Barskiy was also cross examined regarding a broker's opinion (Exhibit 25) that had been issued by another individual at CB Richard Ellis on June 2, 2009, which estimated the value of the Debtors' properties somewhat higher than the October 2, 2009 appraisal by Barskiy. But the broker's opinion explicitly stated that it "should not be considered an appraisal," and Barskiy satisfactorily explained the difference between a broker's opinion and an appraisal. Barskiy was also cross examined about a series of e-mails between Barskiy or other representatives of CB Richard Ellis and the Lender (Exhibits 24, 26 through 28) in an attempt to call his October 2, 2009 appraisal into question. However, those e-mails do not diminish the probative value of the October 2, 2009 appraisal.

Barskiy's appraisal of October 2, 2009 and his testimony of value at trial appear to the Court to be complete and to be supported by detailed analyses and calculations. His appraisal shows a combined value of $16.1 million for the Dime Building and the garage at this time. While it is true that his earlier appraisal of December 18, 2007 (Exhibit 4) showed a higher value, the difference was adequately explained by Barskiy. It is also important to note that even the earlier appraisal, with differing assumptions from the October 2, 2009 appraisal, produced a value for the Debtors' properties that was still significantly lower than the outstanding debt owed by the Debtors to the Lender. The Court considers Barskiy's testimony regarding the value of the Debtors' properties as of October 2, 2009 to be persuasive. Barskiy's projected value of the properties as of October 2, 2014 is obviously not nearly as reliable because it is a future value. However, the methodology he used is consistent with the methodology that he applied to determine the value of the Debtors' properties as of October 2, 2009. Therefore his opinion is still somewhat probative of the ability of the Debtors to pay the $30 million balloon payment that will become due in five years under the

third amended plan. Barskiy's testimony raises serious concerns about the feasibility of the Debtors making that payment out of the sale or refinancing of these properties.

The Lender's final witness was Rodney Crawford. Crawford is a certified public accountant and financial consultant, with over 25 years of experience in business valuations, real estate and financial analysis. He has served as an expert witness many times, and is an expert in forensic accounting, financial analysis, business valuations and insolvency. The Lender engaged Crawford to analyze the historical financial statements of the Debtors, including both audited and unaudited statements, to review the Debtors' projections, and to review certain of the appraisals of the Debtors' properties. Crawford was not asked to prepare his own set of projections, but rather was asked to compare the projections submitted by the Debtors with the Debtors' historical financial information and with the projections contained in the appraisals he reviewed for the purpose of identifying where the differences exist. Crawford was not asked to provide a value of the Debtors' properties, nor an opinion regarding an appropriate interest rate.

Crawford prepared a number of exhibits to illustrate a comparison of the Debtors' historical financial information with the Debtors' projections, and the projections developed by the appraisers of the Debtors' properties (Exhibit 1059). Crawford also developed a number of his own exhibits (Exhibits 1072 through 1074) to reflect how much more the Debtors will need in cash flow to service the Lender's secured claim and the Lender's unsecured claim if the interest rate required to be paid by the Debtors to the Lender increases above the prime rate of 3.25% that the third amended plan presently utilizes. Although Crawford had reservations about the reasonableness of the assumptions made by the Debtors in their projections, Crawford testified that even if the Debtors' projections contained in Exhibit 9 are accepted, the Debtors do not have sufficient cash to make the

payments required upon confirmation of the third amended plan nor will they have sufficient cash flow to make the required payments after confirmation. Crawford performed a number of calculations with interest rates in excess of the Debtors' proposed interest rate. Each demonstrated an annual cash shortfall for the Debtors. Crawford also could not ascertain why the Debtors' projections assume an opening cash balance of $1 million. Without that opening cash balance of $1 million, Crawford pointed out that the Debtors' cash flow shortage is even greater. On cross examination, Crawford admitted that he did not prepare any of his own projections, nor perform a forensic accounting analysis in this case. Crawford also acknowledged that even though he used various interest rates in his illustrations that show the Debtors not having sufficient cash flow to service the Lender's claims, he is not an interest rate expert.

In sum, Crawford testified that the Debtors' own projections do not show an ability to service the Lender's claims under the third amended plan, particularly if the Debtors' assumptions regarding their beginning cash balance of $1 million and an interest rate of 3.25% are rejected. Crawford also performed a sensitivity analysis to show the increased cash flow that would be required to service the debt with the Lender at various higher interest rates. After examining the Debtors' historical financial information, the Debtors' projections, the appraisers' projections, and applying various interest rates to the Debtors' projections, Crawford testified that he did not believe that the Debtors' third amended plan was feasible because, regardless of the interest rate applied, the Debtors own projections show that they do not and will not have the cash sufficient to meet the required payments under the third amended plan.

-40-

Some of the exhibits introduced into evidence by the Debtors and the Lender were not discussed by the witnesses nor otherwise referred to during the confirmation hearing. Nonetheless, the Court has reviewed and considered those exhibits.

In addition to the witnesses they called and the exhibits they introduced, the Debtors and the Lender jointly requested that the Court conduct an on-site physical inspection of the Dime Building and the garage. The Court granted that request and conducted the judicial inspection on November 4, 2009. The garage was clean and well maintained. The connection between the Old Garage and the New Garage was seamless. It was evident that substantial effort went into the renovation of the Dime Building to preserve the craftsmanship and aesthetics of a 1912 building, designed by a renowned architect. The u-shaped floor plate allows natural light into the interior offices. Significant upgrades provide for modern functionality. The unfinished floors are aptly described as "raw," but with the structural, mechanical, electrical and other systems in place. Overall, both the garage and the Dime Building displayed the obvious care and attention of the owners.

## V. Analysis

### A. Determination of Interest Rate

The Debtors and the Lender agree that a pivotal issue in this case is what interest rate the Debtors are required to pay to the Lender in order to confirm the third amended plan. The determination of an appropriate interest rate affects the feasibility of the plan, the determination of whether the plan meets the fair and equitable test, and whether the plan is proposed in good faith. The Court will therefore consider this issue first.

Section 1129(b) of the Bankruptcy Code provides no guidance for calculating the cramdown interest rate required to be paid to confirm a plan of reorganization over a dissenting class of secured claims or unsecured claims.  The plurality in Till v. SCS Credit Corp., 541 U.S. 465 (2004), resolved a similar issue with respect to the interest rate required to be paid to an objecting secured creditor in the Chapter 13 context.  The lower courts had previously used four different approaches – "the formula rate, the coerced loan rate, the presumptive contract rate, or the cost of funds rate[.]"  Id. at 473.  The Till plurality rejected the coerced loan, presumptive contract and cost of funds rates, and held that the formula approach should be used to determine the interest rate required to be paid on secured claims in Chapter 13 cases.  Id. at 477-80.  But, the Court noted in dictum that the result is not necessarily the same in the Chapter 11 context.  "[W]hen picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce."  Id. at 477 n.14.

After Till, the  Sixth Circuit squarely addressed the proper cramdown interest rate for a secured claim in a Chapter 11 plan of reorganization in Bank of Montreal v. Official Committee of Unsecured Creditors (In re American HomePatient, Inc.), 420 F.3d 559 (6th Cir. 2005).  In American HomePatient, the Sixth Circuit held that "the market rate should be applied in Chapter 11 cases where there exists an efficient market.  But where no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should employ the formula approach endorsed by the Till plurality."  Id. at 568.

The formula approach "begins by looking to the national prime rate[.]"  Till, 541 U.S. at 478-79.  That rate reflects the market's estimate of what "a commercial bank should charge a

creditworthy commercial borrower to compensate for opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." Id. at 479.

> Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the [formula] approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan.

Id. Other risk factors to consider include the debt service coverage ratio, the loan-to-value ratio, and the quality of any guarantors. See In re Bloomingdale Partners, 155 B.R. 961, 983-84 (Bankr. N.D. Ill. 1993). The evidentiary burden is on the creditors to establish the appropriate risk adjustment. Till, 541 U.S. at 479; see also General Electric Credit Equities, Inc. v. Brice Road Developments, L.L.C. (In re Brice Road Developments, L.L.C.), 392 B.R. 274, 280-81 (B.A.P. 6th Cir. 2008) (finding that the lender did not meet its burden of proof as to the cramdown interest rate).

The first question then is whether there exists an efficient credit market. "[T]he term 'efficient market' was not defined in Till or American HomePatient and neither case offers much guidance in determining how to ascertain the efficient market rate, nor . . . suggest[s] whether the rate may vary based on loan criteria." Brice Road Developments, 392 B.R. at 280 (internal quotation marks and citation omitted). Both the Debtors and the Lender introduced expert testimony on this issue. Maher testified for the Debtors that there presently does not exist an efficient credit market for commercial real estate loans secured by office buildings. Ferrell testified for the Lender that he believes that the credit market is acting efficiently in the sense that it is now appropriately pricing commercial real estate loans to reflect their risk. By appropriately pricing them today, the result is that there are few, if any, commercial real estate loans being made. Although Ferrell believes the market to be acting efficiently, he acknowledged that commercial real estate loans are

-43-

not available in the credit market today. Therefore, both the Debtors' interest rate expert and the Lender's interest rate expert agree that there are no commercial real estate loans available in the market today for properties like those owned by the Debtors. The evidence establishes that there is no credit market for commercial real estate loans secured by office buildings located in the central business district of downtown Detroit that the Court can turn to for guidance. Accordingly, under American HomePatient, the Court must apply the formula approach to determine an appropriate cramdown interest rate.

Both the Debtors and the Lender agree that the national prime rate of interest at the start of the confirmation hearing on November 4, 2009 was 3.25%. Maher testified for the Debtors that under the formula approach, an appropriate risk adjustment is 1%. Maher did not break down that risk adjustment by referencing any of the factors identified in Till. Nor did he break it down by reference to the secured and unsecured portions of the Lender's claim. The lender's expert, Ferrell, on the other hand, examined each of the factors referenced in Till, and made specific risk adjustments for each of them. First, Ferrell made a 2% risk adjustment based upon the circumstances of this case. Second, Ferrell made a 2% risk adjustment to reflect the nature of the security in this case. Third, Ferrell made a 3% risk adjustment to reflect his belief that there is a substantial risk of nonpayment because of the lack of feasibility of the Debtors' third amended plan. Overall, Ferrell made a 7% risk adjustment to the prime rate of interest.

Both Maher and Ferrell seemed knowledgeable and credible. However, Ferrell had more extensive experience and knowledge about interest rates, and his testimony was much more detailed than Maher's. The Court gives greater weight to Ferrell's testimony than to Maher's testimony. But that does not mean that the Court completely accepts each of the specific risk adjustments suggested

by Ferrell.  The Court is persuaded that Ferrell's 2% risk adjustment based upon the circumstances of this case is well supported by Ferrell's observations that the third amended plan does not require any equity contributions nor does it provide any funds for tenant alterations or leasing commissions. Further, even if the Court were to disregard Barskiy's testimony that the value of the Dime Building and the garage is only $16.1 million, and instead accept the $20 million value ascribed to those properties by the Debtors in their disclosure statement, the secured portion of the Lender's Class I claim is still at 100% loan to value, with the $16.5 million balance of the Lender's Class I claim being entirely unsecured.  Moreover, the guaranties of the Lender's claim are capped and are the subject of a lawsuit in Oakland County Circuit Court.  In the Court's view, Ferrell's 2% adjustment for risk to reflect the circumstances of this case is appropriate and is well supported by the evidence.

However, the Court is not persuaded that a separate, additional 2% risk adjustment to reflect the nature of the security is appropriate in this case.  Much of Ferrell's testimony concerning his first 2% risk adjustment regarding the circumstances of this case focused on the absence of cash in the bankruptcy estate for the ongoing development of the Dime Building.  Ferrell pointed out that there is insufficient cash set aside for tenant alterations, and that the third amended plan does not provide a workable source of such cash.  However, in analyzing the risk adjustment to reflect the nature of the security in the case, Ferrell again seemed to rely on the unfinished nature of the building and the absence of cash in the third amended plan to complete the renovations.  Ferrell also believes that the Dime Building is less desirable, as an older building with a u-shaped floor plan. But it was not clear to the Court from this testimony why that fact should result in another risk adjustment because of the nature of the security.  There was no testimony to suggest that the Dime Building will deteriorate in condition during the life of the third amended plan or other evidence

about the Dime Building and garage that would support a 2% risk adjustment for the nature of the security. The Court rejects that risk adjustment.

The final risk adjustment made by Ferrell was 3% because of the substantial risk in the feasibility of the Debtors' third amended plan. Ferrell considered the Debtors' projections to be overly optimistic and, therefore, there is a risk of nonpayment. He identified a number of facts supporting his conclusion in that regard. The Court agrees that Ferrell's testimony and the other evidence in the record demonstrates a significant risk of nonpayment, especially with respect to the balloon payment in five years. The Court is persuaded that a 3% risk adjustment to the Lender's entire claim is appropriate to compensate for the risk of nonpayment.

In the Court's view, determining an appropriate adjustment to reflect the risk of nonpayment requires a separate consideration of the secured and unsecured portions of the Lender's claim. Although the third amended plan incongruously states that all of the Lender's $36.5 million claim is in Class I, the third amended plan does seem to recognize what § 506(a)(1) of the Bankruptcy Code provides: the Lender's claim "is a secured claim to the extent of the value of such creditor's interest in the estate's interest" in the Dime Building and the garage, "and is an unsecured claim to the extent that the value of such creditor's interest" in the Dime Building and the garage "is less than the amount of such allowed claim." In other words, under § 506(a)(1) of the Bankruptcy Code, the Lender has an allowed secured claim to the extent of the value of the Dime Building and the garage (i.e., either $20 million according to the Debtors, or $16.5 million according to the Lender) and has an allowed unsecured claim for the deficiency (i.e., either $16.5 million according to the Debtors, or $20.1 million according to the Lender). Notwithstanding § 506(a)(1), a class of secured creditors under a Chapter 11 plan of reorganization may elect under § 1111(b)(2) of the Bankruptcy Code to

-46-

have their class of allowed claims be treated entirely as secured claims and not have them bifurcated into secured and unsecured claims by application of § 506(a)(1). If a secured creditor makes a § 1111(b) election, its "lien is not stripped down by § 506(d)." Brice Road Developments, 392 B.R. at 285 (internal quotation marks and citation omitted). Bankruptcy Rule 3014 provides the method and the time to make an election under § 1111(b)(2). It is undisputed that the Lender, which is the only claimant in Class I, did not make an election under § 1111(b)(2) for Class I. Therefore, § 506(a)(1) of the Bankruptcy Code dictates that under Class I of the third amended plan, the Lender has an allowed secured claim (either $16.1 million or $20 million, depending on the value of the Dime Building and garage) and an allowed unsecured claim (either $20.4 million or $16.5 million).

In argument, the Debtors' counsel asserted that notwithstanding the "allocation" of a secured portion and an unsecured portion of the Lender's claim in Class I of the third amended plan, the Debtors somehow believe that they have effectively made a § 1111(b)(2) election for Class I so that the Lender's entire claim of $36.5 million should be treated as though it is a secured claim. There is no legal or factual support for that assertion. The Lender has not made a § 1111(b)(2) election, and the deadline under Bankruptcy Rule 3014 to make that election has passed. The law does not permit the Debtors to make a § 1111(b)(2) election for the Lender.[5] Therefore, at least $16.5 million (and perhaps more) of the Lender's claim that is classified under Class I of the Debtors' third amended plan is an unsecured claim. The question then becomes whether or not an additional adjustment should be made to reflect a greater risk of nonpayment with respect to the unsecured portion of the claim.

---

[5] At closing argument, the Lender's counsel reiterated that the Lender had not made an election under § 1111(b)(2) and did not intend to make such election.

Neither interest rate expert witness made a risk adjustment for the unsecured portion of the Lender's Class I claim separate from and in addition to the risk adjustment for the secured portion of the Lender's claim. Maher treated the secured and unsecured portions as one claim. Ferrell, however, did testify that there is a significantly greater risk of nonpayment of the unsecured portion of the claim, and described it as more closely resembling mezzanine or equity financing than a secured loan for purposes of the formula approach. Because, by definition, there is no security for the repayment of the $16.5 million unsecured claim, the Court finds persuasive Ferrell's testimony that the risk of nonpayment of the unsecured claim is necessarily greater. That is particularly true for the balloon payment on the unsecured claim in five years, because the Debtors introduced no meaningful evidence to show that they will be able to make the balloon payment on the unsecured Class I claim in five years.

After considering the testimony of both Maher and Ferrell, and after weighing all of the evidence in this case, the Court finds that there is a significant risk of nonpayment both of the Lender's secured claim and the Lender's unsecured claim. The Court is persuaded that Ferrell's 3% adjustment for the risk of nonpayment of the Class I claims is well supported by his testimony. As the Court has also noted, there is a strong argument to be made that the risk of nonpayment of the unsecured portion of the Lender's Class I claim is even greater than the risk of nonpayment of the secured portion of the Lender's Class I claim. That additional risk would seem to support an even higher interest rate adjustment to the unsecured portion of the Lender's Class I claim. However, as neither Maher nor Ferrell attempted to quantify this additional risk with respect to the unsecured portion of the Class I claim, the Court declines to do so itself. In any event, the Court finds that

-48-

Ferrell's 3% adjustment to reflect the risk of nonpayment of the Lender's entire Class I claim is appropriate.

To recap, the Court concludes that the Lender has met its burden to prove that a higher rate of interest is required than the rate proposed by the Debtors. Using the formula approach, the Court finds that an appropriate cramdown interest rate under § 1129(b)(2)(A) for the Lender's secured claim is 5% over the prime rate of interest. Using the formula approach, the Court finds that an appropriate cramdown rate of interest for the Lender's unsecured claim under § 1129(b)(2)(B) is 5% over the prime rate of interest. With the prime rate at 3.25% as of trial, the formula approach calls for a current interest rate at 8.25% for both the Lender's secured claim and the Lender's unsecured claim. This rate is greater than the 6 to 6-1/2% that Paramount Bancorp had been recently charging for commercial real estate loans, according to the Debtors' expert witness, Maher, but still less than the financing for other debtors in Chapter 11 real estate reorganizations that the Lender's expert, Ferrell, described as being at 12 to 13% interest rates.

## B. Plan Feasibility

In order to be confirmed, a plan must be feasible. This requirement is found in § 1129(a)(11). The Court must find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). "Feasibility is a mandatory requirement for confirmation." In re Made in Detroit, Inc., 299 B.R. 170, 175 (Bankr. E.D. Mich. 2003). "The debtor bears the burden of proving by a preponderance of the evidence that the plan is not likely to fail." In re Eastland Partners Limited Partnership, 149 B.R. 105, 108 (E.D. Mich. 1992).

"'[T]he feasibility standard is whether the plan offers a reasonable assurance of success.

Success need not be guaranteed.'" Eastland Partners, 149 B.R. at 108 (quoting Kane v.

Johns-Manville Corp., 843 F.2d 636, 649 (2nd Cir. 1988)). "To provide such reasonable assurance,

a plan must provide a realistic and workable framework for reorganization. The plan cannot be

based on 'visionary promises;' it must be doable." Made in Detroit, 299 B.R. at 176 (citations

omitted). "Feasibility determinations must be firmly rooted in predictions based on objective fact."

Danny Thomas Properties II L.P. v. Beal Bank, S.S.B. (In re Danny Thomas Properties II L.P.),

241 F.3d 959, 964 (8th Cir. 2001) (internal quotation marks and citation omitted).

In Teamsters National Freight Industry Negotiating Committee v. U.S. Truck Co. (In re

U.S. Truck Co.), 800 F.2d 581 (6th Cir. 1986), the Sixth Circuit noted that the following factors are

relevant to determining whether the reorganized company is likely to liquidate:

> (1) the adequacy of the capital structure; (2) the earning power of the business;
> (3) economic conditions; (4) the ability of management; (5) the probability of the
> continuation of the same management; and (6) any other related matter which
> determines the prospects of a sufficiently successful operation to enable performance
> of the provisions of the plan.

Id. at 589 (citation omitted).

Other factors considered by courts include the past financial performance of the debtor, the

availability of credit if the plan is dependent on additional financing, and the term of the plan. See

In re Global Ocean Carriers Ltd., 251 B.R. 31, 46 (Bankr. D. Del. 2000) (finding feasibility where

exit financing was not finalized but the lenders had "issued a commitment letter and/or agreed to

term sheets which [were] detailed and contingent only upon final documentation"); In re Eastland

Partners, 149 B.R. at 108-09 (plan feasible based on credible testimony of realistic estimates of

revenue and expenses that were "consistent with its historical evidence, perhaps a bit on the

-50-

conservative side" combined with "a viable exit strategy to pay off" a loan within the projected time frame); In re Westpark Village Apartments of Douglas Co., Ltd., 133 B.R. 894, 897-98 (Bankr. S.D. Ohio 1991) (plan feasible based on testimony that the debtor's general partner agreed to provide necessary funding, which was memorialized in a modification filed with the court).

To determine whether the Debtors' third amended plan is feasible requires consideration of three different points in time. First, do the Debtors have sufficient funds to make the payments required by the third amended plan on confirmation of the plan? Second, if the Debtors make the payments required on confirmation, do the Debtors' projections of future operations demonstrate an ability to make the payments under the third amended plan going forward? Third, does the evidence show that the Debtors are likely to be able to make the $30 million balloon payment to the Lender in five years?

Turning to the first point in time, what claims does the third amended plan require the Debtors to pay on confirmation, what are the amounts of those claims, and what is the Debtors' source of funds to make the payments? The third amended plan requires the Debtors to pay all allowed administrative expense claims on the "first periodic distribution date" after the allowance of such claims. The third amended plan defines the periodic distribution date as the first business day of each month, then states that the first periodic distribution date is the periodic distribution date occurring after the effective date of the plan. The effective date of the plan is defined as the confirmation date. The confirmation date is defined as the date of the entry of a confirmation order. The third amended plan contains somewhat confusing definitional provisions regarding administrative expense claims, professional fee claims and dates for distribution, but, in substance, the third amended plan requires payment of all such claims upon confirmation. The third amended

-51-

plan also requires payment of all allowed unsecured convenience class claims within Class IV upon confirmation.

What does the evidence show about the aggregate amount of the claims to be paid upon confirmation and the source of the funds to pay them? The Debtors' testimonial evidence was, at best, imprecise and somewhat conflicting. Glazier testified that the Debtors estimated professional fees of $500,000.00, but was unable to give an estimate as to the additional amount to be paid to the convenience class claims. Nadhir initially testified on direct examination that the Debtors estimated that they need between $400,000.00 to $500,000.00 of total cash payments on confirmation. However, upon cross examination, Nadhir admitted that the Debtors had previously estimated in their answers to interrogatories that the amount of cash needed at confirmation is $625,000.00. Of that amount, Nadhir seemed to think that $350,000.00 is for professional fees, leaving $275,000.00 for other administrative and convenience class claims. Upon further questioning, Nadhir said that he had no reason to question Glazier's estimate of $500,000.00 for professional fees, and even acknowledged that the total cash needed at confirmation was more like $775,000.00. Neither Glazier nor Nadhir testified that the Debtors sought from any of their professionals an estimate of the professional fees incurred as of confirmation. Nor did they testify that the Debtors conducted any review of the claims that might fall within the convenience class required to be paid on confirmation. It is very difficult to tell from Nadhir's and Glazier's testimony exactly what cash the Debtors need in order to confirm the third amended plan, and what payments they will be required to make upon confirmation. Neither witness seemed to have a good handle on these facts.

Nor are the Debtors' projections contained in Exhibit 9 of any help in trying to identify what payments the Debtors will be required to make upon confirmation. In Exhibit 9, the Debtors'

projection for the calendar year 2010 estimates legal fees to be paid by the Debtors at $10,000.00, and accounting fees to be paid by the Debtors at $28,500.00. Those figures are carried annually for each of the subsequent years of the Debtors' projections set forth in Exhibit 9. The projections do not attempt to address the professional fees that have been incurred in these Chapter 11 cases, which have been estimated at various times by Glazier and Nadhir at between $350,000.00 and $500,000.00. Nor does the Debtors' Exhibit 9 estimate the amount of the convenience class claims that have to be paid under the third amended plan on confirmation. The Debtors' evidence simply does not address with any degree of precision or accuracy the amount that the Debtors will be required to pay upon confirmation if the third amended plan is confirmed.

Assuming that the Debtors are required to make $775,000.00 in cash payments at confirmation, as Nadhir seemed to admit, the next question for determining feasibility is what funds do the Debtors have available to them to make these cash payments. The Debtors introduced evidence in the form of bank account statements (Exhibits 34 through 44) to show that they presently have the sum of $1,588,000.00 in cash to make the payments required under the third amended plan upon confirmation. The Debtors acknowledge that they have paid interest to the Lender through May, 2009, but that they have not made any payments to the Lender since then. However, the Debtors concede that they have continued to collect the rents from the Dime Building and the revenue from the garage since that date. The rents and revenue collected by the Debtors during the bankruptcy case are the source of the $1,588,000.00. This appears to be a sufficient sum

from which to pay the $775,000.00 due upon confirmation, but only if the Debtors have the right to use the $1,588,000.00 of rents and revenue collected during the bankruptcy case.[6]

A creditor that holds both a mortgage on real property *and* a security interest in rents "has two distinct security interests[.]" Travelers Insurance Co. v. River Oaks Limited Partnership (In re River Oaks Limited Partnership), 166 B.R. 94, 97 (E.D. Mich. 1994). "Where [ ] there is a specific assignment of rents given as security, a diversion of any portion of the rents to a party other than the secured party is clearly a diminution of the secured party's interests in the assignment of rents portion of the security." Id. at 99. To protect against that diminution in value, a debtor must provide adequate protection for the interest in rents above and beyond any adequate protection for the interest in the real property. Id. at 94 ("Each of these interests must be adequately protected.").

"[A]n independent determination must be made as to whether a secured party that has a perfected assignment of rents is adequately protected." Id. at 97. "[W]hether a creditor is adequately protected pursuant to § 363 should be determined based on factors such as whether the value of the security exceeds the debt; or whether there is a reorganization plan that provides for 'full payment' to the creditor." Id. at 98 (citation omitted).

If the amount of the debt exceeds the value of the collateral and the lender is undersecured, a debtor's use of rents further decreases the value of the collateral. "Any such decrease attributable to the [d]ebtor's usage, therefore, must be protected by cash payments *from another source*, an

---

[6] If Nadhir is correct in his estimate of $775,000.00 of cash payments required upon confirmation, it is difficult to understand why Glazier and Nadhir both estimated that after payment of that amount from the $1,588,000.00, they still assumed that the Debtors would have $1 million of cash post-confirmation which they used as the starting point for their cash flow projections in Exhibits 13 and 15. As will be seen later, without that $1 million of cash as the starting point for the Debtors post-confirmation, the feasibility of the Debtors' third amended plan is doubtful in the post-confirmation years.

additional or replacement lien, or other such indubitable equivalent." In re Willowood East Apartments of Indianapolis II, Ltd., 114 B.R. 138, 145 (Bankr. S.D. Ohio 1990) (emphasis added); see also Stearns Building v. WHBCF Real Estate (In re Stearns Building), No. 98-1257, 1998 WL 661071 at *4-5 (6th Cir. Sept. 3, 1998) (noting that "the record does not indicate that Debtor possesses any unencumbered assets" from which to pay adequate protection for the use of cash collateral in the form of rents). On the other hand,

> [i]f there is adequate protection under § 363, then the debtor may use the cash collateral for expenses not directly related to the operation and maintenance of the apartment project, e.g., administration expenses, because in that situation, the secured party has no right to object. If it is adequately protected, its security interest is not jeopardized by the payment of such expenditures.

In re River Oaks, 166 B.R. at 97-98. "[T]he regeneration of the rents and their use for the operating and maintaining of the building" does not meet the adequate protection requirement of § 363. Id. at 99.

The $1,588,000.00 of cash in this case consists entirely of post-petition rents from the Dime Building and the garage that are held by the Lender in a lockbox. The Debtors do not dispute that those rents are subject to the Lender's perfected assignment of rents. Rather, the Debtors assert that they are able to use the $1,588,000.00 because they are adequately protecting the Lender's interest in such rents. According to the Debtors, they will use approximately $150,000.00 or more of these rents to pay the convenience class of unsecured creditors upon confirmation. The Debtors will also then use possibly $500,000.00 or more to pay professional fees. The Debtors intend to use the balance of the funds to help make up cash flow shortages after confirmation. The Debtors insist that the Lender's interest in the rents is nonetheless adequately protected because the third amended plan proposes to ultimately pay the Lender in full.

-55-

The Debtors rely in part on <u>In re Coventry Commons Associates</u>, 149 B.R. 109 (Bankr. E.D. Mich. 1992), where the court allowed the debtor to use cash collateral to pay professional fees upon confirmation despite the lender being undersecured. The lender's claim in that case was $9.2 million and the property was valued at $8 million. The debtor accumulated $600,000 of rents during the Chapter 11 case. The debtor's plan proposed to pay the lender $400,000 upon confirmation, or one-third of the $1.2 million deficiency claim, and use the balance of the rents to pay Chapter 11 administrative expenses. <u>Id.</u> at 110-11. The court found that the plan was feasible and granted confirmation.

The Court is not persuaded that the Debtors have met their burden to prove that the Lender is adequately protected in this case. This is a far different set of facts than was present in <u>Coventry Commons</u>. Unlike <u>Coventry Commons</u>, the Debtors are not proposing to pay *any* portion of the rents to the Lender for application to the Lender's claim on confirmation. Also, although there was a deficiency in <u>Coventry Commons</u>, it was nowhere near the magnitude of the deficiency claim in this case. The third amended plan leaves the Lender with an unsecured claim of $16.5 million (even greater if the Court accepts the valuation evidence of the Lender). Further, the third amended plan does not leave the Lender's assignment of rents and leases completely in place going forward. Instead, it has a mechanism that, although confusing, appears to enable the Debtors to prime the Lender's assignment of rents going forward to obtain new funds from third-party lenders to complete renovations for new tenants. The fact that the third amended plan proposes to eventually pay the Lender's secured claim and unsecured claim in full over five years is not adequate protection for the Debtors' immediate use of the $1,588,000.00 of rents and revenues collected during the Chapter 11 cases to pay professional fees, other administrative expenses, unsecured convenience class claims

-56-

and to create a cash flow reserve going forward. The Debtors are not proposing any replacement collateral or other indubitable equivalent for their spending of the $1,588,000.00 of rents and revenues they have collected, but are simply proposing to pay these funds back in a balloon payment, five years from confirmation. The third amended plan does not leave the Lender with adequate protection for its interest in the $1,588,000.00 of rents presently held in the lockbox. Those funds are therefore not available to make the $775,000.00 of cash payments that the third amended plan requires on confirmation. The Debtors' evidence does not show that they have any other source of funds to make the payments required by the third amended plan on confirmation. As a result, the Court finds that the third amended plan is not feasible immediately upon confirmation.

Even if the Debtors had the cash to make the required payments upon confirmation, the Debtors must next prove that there is a reasonable assurance that they will be able to make the payments in years one through five of the third amended plan. This determination "must be firmly rooted in predictions based on objective fact." In re Danny Thomas Properties II L.P., 241 F.3d 959, 964 (8th Cir. 2001). The Debtors must demonstrate the amount to be paid and that they will have the cash available to make those payments.

To ascertain whether the Debtors' projected cash flow in Exhibit 13 demonstrates sufficient cash to service the Lender's claims during the third amended plan first requires an examination of the beginning cash figure that the Debtors have assumed. The Debtors' cash flow schedule in Exhibit 13 begins with an estimate of $1 million in beginning cash. As noted previously, this estimate is not firmly rooted in objective fact. Assuming for the moment that the Debtors have the right to use the $1,588,000.00 cash in the lockbox, and assuming the Debtors' estimate of

-57-

$775,000.00 the amount to be paid upon confirmation, leaves only about $800,000.00 in beginning cash. The Debtors' opening cash balance on Exhibit 13 therefore appears to be overstated by $200,000.00. But even if the Court assumes that the Debtors have an opening cash balance of $1 million, and accepts without qualification the Debtors' projections of future operations in Exhibit 9, the Debtors have failed to prove that they will have sufficient cash flow available to service the Lender's secured and unsecured claims going forward.

Applying a cramdown interest rate of prime plus 5% to the Lender's $36.5 million Class I claim, the Debtors will have insufficient cash flow to make the payments with respect to the Lender's secured claim and unsecured claim after confirmation. To illustrate, assume that the prime rate of interest remains static at 3.25%, and also assume that the Court were to accept the $20 million value for the Dime Building and the garage set forth in the Debtors' disclosure statement, that would leave the Lender with a $20 million secured claim and a $16.5 million unsecured claim. Performing these calculations shows that the cash required to be paid by the Debtors to the Lender on its secured $20 million claim with a 30-year amortization and an interest rate of 8.25% would be $1,803,039.84 annually. Using those same assumptions, these calculations show that the cash required to be paid to the Lender on its unsecured $16.5 million claim with a 15-year amortization and an interest rate of 8.25% is $1,920,877.92 annually. Therefore, the total cash required to service the debt to the Lender under the third amended plan would be $3,723,917.76 annually.

The Debtors' projections in Exhibit 9 show that the Debtors' projected cash flow before debt service for the five years of the third amended plan are as follows:

| | |
|---|---|
| 2010 | $2,502,500.00 |
| 2011 | $2,656,195.00 |
| 2012 | $3,366,851.00 |
| 2013 | $3,612,346.00 |

Therefore, even if the prime rate of interest does not increase from 3.25%, the Debtors will not have sufficient cash flow to make the required Class I payments to the Lender in any year under the third amended plan. Moreover, this illustration is based upon the Court's acceptance of the Debtors' alleged value of $20 million for the Dime Building and the garage. Of course, if the Court accepts the Lender's alleged value of these properties, the cash flow requirements to pay the Lender's Class I claims are even greater.

Even worse for the Debtors, the evidence in the record does not show that it is likely that the prime rate of interest will remain at 3.25%. The present prime rate of interest of 3.25% is at a 30-year low (Exhibit 1056). Further, the Blue Chip Financial Forecast, relied upon by Ferrell in his expert report, projects that the prime rate of interest will increase during each year of the Debtors' third amended plan. If the Court looks only at the "bottom ten," as predicted in the Blue Chip Financial Forecast, and disregards all of the other forecasts, it is still indisputable in this record that the prime rate of interest is projected to increase steadily during the life of the Debtors' third amended plan. The Debtors offered no contrary evidence. The "bottom ten" of predictors in the Blue Chip Financial Forecast projects the prime rate of interest to go to 3.8% in 2011, 4.7% in 2012, 5.5% in 2013, and 5.9% in 2014. With a formula approach risk adjustment of 5% on the Class I claims, the Debtors will not have nearly sufficient cash flow to service the required payments to the Lender under the third amended plan.

-59-

The Debtors did not address at all at the confirmation hearing the payments required by the third amended plan in years one through five for Class IV general unsecured claims that do not fall within the convenience class. What does the third amended plan require to be paid to them, and will the Debtors have the means to make those payments? The Debtors' third amended plan proposes Class IV allowed claims be paid in two alternate ways, at the claimants' election. Claimants are to receive either a single distribution of 30% of the allowed amount of their claims one year after confirmation, or 50% of the allowed amount of their claims in 16 equal installments beginning on the first periodic distribution date and ending on the fourth anniversary of confirmation.

The ballot summary filed by the Debtors (docket entry no. 120), tabulates the ballots for each of the three Debtors. For the most part, the ballots filed in the Griswold Properties, LLC and Colossae, LLC cases were also filed in the Griswold Buildings, LLC case. Just looking at the voting amount of Class IV allowed general unsecured claims in the Griswold Buildings, LLC case, the total is $19,122,238.84. However, the Debtors' ballot summary includes within it an accepting vote by Griswold Properties, LLC against Griswold Building, LLC in the amount of $4,312,140.00. If that inter-debtor claim is subtracted from the total amount of the Class IV claims voting to accept the third amended plan, the remaining balance is $14,872,336.00. However, some of the remaining Class IV claims are convenience class claims, to be paid by the Debtors on confirmation. Although the testimony of Glazier and Nadhir varied on this issue, it appears that the highest amount that would be required to be paid to the convenience class is $275,000.00. Subtracting that amount from the remaining balance of the Class IV claimants that submitted ballots voting to accept the third amended plan still leaves a total of $14,535,098.84 of Class IV claims. If all of them opt for the 30% cash payment one year from confirmation, the Debtors will be required to pay them

-60-

$4,360,529.65 (i.e., 30% of $14,535,098.84). Alternatively, if those same Class IV unsecured claimants elect to receive 50% of their allowed claims in 16 equal installments, the Debtors will be required to make 16 quarterly installment payments to them, each in the amount of $454,221.84 beginning one year after confirmation. While the Debtors may object to some or even all of these claims, the point is that the Debtors' projections in Exhibit 9 omit any provision for these payments. Nor did any of the Debtors' witnesses address in any testimony this potentially very significant problem. The Debtors therefore have failed to demonstrate that their projected cash flow will be sufficient to pay either the Class I or Class IV claims in years one through five of the third amended plan.

The third point in time to determine feasibility is at the end of five years when the balloon payment comes due. The third amended plan anticipates funding the $30 million balloon payment through either a sale or a refinancing. Again, the questions are what is required to be paid and will the Debtors have the means to make that payment. According to the Debtors' witnesses, if the third amended plan is confirmed and the Debtors make all of the payments up to the balloon payment in five years, the balloon payment will be approximately $30 million. Both a sale and a refinance depend in large part on the value of the Dime Building and garage in 2014. The Debtors did not introduce any evidence to show that it is likely that they will be able to make the balloon payment in five years. The Debtors' own disclosure statement starts from the premise that the Dime Building and the garage are worth $20 million. The only appraisal that the Debtors introduced into evidence was an appraisal dated August 11, 2008, prepared by Allen & Associates (Exhibit 5). That appraisal set forth a market value of the Dime Building and the garage of $24.5 million as of June 23, 2008. The Debtors did not elicit any testimony regarding this appraisal. Nadhir testified that he believes

-61-

the value of the properties presently to be in the $30 million vicinity, but he provided no basis for that estimate. Nor did the Debtors introduce any appraisals, expert testimony or other evidence to corroborate his estimate.

On the other hand, the Lender introduced substantial testimony as to the value of the properties through Barskiy. Barskiy testified both to the market value of the properties today, and to his estimate of the market value of the properties in the future. While predicting the market value of these properties in five years is certainly not an exact science, there is ample other evidence in the record that corroborates Barskiy's testimony that the properties will not have enough value in five years to enable the Debtors to sell or refinance them in an amount sufficient to pay the $30 million balloon payment. Munaco testified persuasively regarding the long term prospects for the commercial office building leasing market in downtown Detroit. There is no evidence in the record to indicate that the leasing market is likely to substantially improve existing occupancy rates and rental rates. Even the Debtors' own expert, Kahn, admitted that the ability of the Debtors to make the balloon payment in five years will all come down to the value of the properties in five years, and the capitalization rate that will be applied at that time to the net operating income generated by those properties.

This case is similar to M & S Associates, Ltd., 138 B.R. 845 (Bankr. W.D. Tex. 1992), where the debtor's only assets were three apartment buildings, and the only source of income was the cash flow from the apartments. The debtor was required to make a $21 million balloon payment at the conclusion of the plan after four years. The court assumed that the debtor would be able to stay current on its payments to the lender up to the maturity date. However, with the only income

consisting of rents, the debtor had no other source from which to make the balloon payment. The court concluded that the plan was not feasible because it was

> highly unlikely that the Apartments could be sold or refinanced to repay the entire unpaid principal balance during or at the end of the Plan. Confirmation of the Plan would merely allow the Debtor to postpone the inevitable, and to gamble, with the [lender]'s money, on the long shot possibility of a drastic improvement in the real estate market.

Id. at 852; see also In re Made in Detroit, Inc., 299 B.R. 170, 176-77 (Bankr. E.D. Mich. 2003) (denying confirmation, even though the debtor was "sincere, honest, and willing," because the plan was conditional on the debtor obtaining a $15 million loan and there was "no reasonable assurance that the [ ] loan will ever close" or that the property would be appraised at a value sufficient to serve as collateral for the loan).

Even if the Court concludes that Barskiy's estimate of the value of the properties in five years is low, the Debtors simply do not have any evidence to support their contention that the Dime Building and the garage, which presently have a market value ranging from Barskiy's estimate of $16,100,000 to the Debtors' own disclosure statement of $20 million, will have anywhere near sufficient value in five years to enable the Debtors to sell or refinance the properties in an amount sufficient to make the $30 million balloon payment. While the Debtors need not demonstrate that payment of the balloon payment in five years is guaranteed, they must be able to demonstrate by a preponderance of the evidence that the plan is not likely to fail. The Debtors have not done that. The evidence in the record persuades the Court that it is unlikely that the Debtors will be able to make the $30 million balloon payment in five years, even if the Court were to find that they have sufficient cash to make the required plan payments on confirmation, and even if they will have sufficient cash flow to make the required plan payments during the next five years.

-63-

The Court finds that the Debtors have failed to meet their burden to prove that the third amended plan is feasible. The Debtors do not have the right to use the cash in the lockbox to make the cash payments on confirmation. Nor does the evidence show that the Debtors will be able to make the monthly payments to the Lender if an appropriate rate of interest is applied to the Lender's claims. Most compelling, however, is the absence of probative evidence to show that it is more likely than not that the Debtors will make a $30 million balloon payment in five years.

### C. Fair and Equitable

The Lender's next objection is that the third amended plan is not fair and equitable to the Lender.

> A chapter 11 reorganization plan may be confirmed if each class of impaired claims accepts the plan, or at least one class of impaired claims accepts the plan. If not all classes of impaired claims accept the plan, the Debtor may utilize the so-called "cramdown" procedure. Under a cramdown, a plan must meet all of the requirements set forth in § 1129(a), except for § 1129(a)(8), and also satisfy § 1129(b).

In re Brice Road Developments, L.L.C., 329 B.R. 274, 284 (B.A.P. 6th Cir. 2008) (footnote omitted).

"The cramdown provisions set forth in [§ 1129(b)] allow courts, despite objections, to confirm a reorganization plan if 'the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.'" Bank of Montreal v. Official Committee of Unsecured Creditors (In re American HomePatient, Inc.), 420 F.3d 559, 565 (6th Cir. 2005) (quoting 11 U.S.C. § 1129(b)(1)).

To be "fair and equitable" to a class of secured claims, the plan must provide

> (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C.§ 1129(b)(2)(A).

To be "fair and equitable" to a class of unsecured claims, the requirements are that

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . .

11 U.S.C. § 1129(b)(2)(B).

The Court has already determined that the Debtors' proposed prime rate of interest for all of the Lender's claims is insufficient to meet the fair and equitable test of § 1129(b)(2)(A) with respect to the Lender's secured claim, and is insufficient to meet the fair and equitable test of § 1129(b)(2)(B) with respect to the Lender's unsecured claim. But even if the interest rate proposed by the Debtors' third amended plan was sufficient under those statutory provisions, the Court is still not persuaded that the Debtors' third amended plan is otherwise fair and equitable. Section 1129(b)(2) makes it clear that the condition that a plan be fair and equitable includes the requirements of § 1129(b)(2)(A) and (B), but does not make those requirements the sole test for a determination that a plan of reorganization is fair and equitable. In this case, there are several

-65-

reasons why the Court does not consider the third amended plan to be fair and equitable, even if the cramdown rate of interest proposed by the Debtors was sufficient to meet § 1129(b)(2)(A) and (B).

First, the third amended plan proposes to take rents collected during the bankruptcy case and use them to pay administrative expense claims, professional fee claims and unsecured, pre-petition creditors, all of which are junior in priority to the secured claim of the Lender. The Debtors are not proposing to use the $1,588,000.00 of cash that has accumulated in the lockbox during the Chapter 11 case to make improvements to the Dime Building or the garage, or pay for tenant alterations or leasing commissions, each of which would enhance the value of the properties going forward. Nor are they proposing to take these rents and pay them to the Lender, even though the Debtors acknowledge that there is a huge shortage of collateral value to secure payment of the Lender's claims. Instead, the Debtors propose to use the Lender's cash collateral to pay claims that have a lower priority under the Bankruptcy Code than the claims of the Lender, without providing any replacement collateral for the Lender. It is hard to see how that is fair and equitable.

Second, even though the Debtors acknowledge that the Lender has a perfected assignment of rents and leases, the third amended plan contains a mechanism that purports to prime the Lender's interest in rents and leases by allowing the Debtors to obtain financing from third-party lenders, at the Debtors' option, secured by a first priority security interest in the rents to be generated from the leases obtained with the tenant improvements provided by such third-party lenders. There is no support under Michigan law for the creation of that type of security interest in rents and leases when there is already a perfected assignment of leases and rents. Nor is there any Bankruptcy Code section or other authority offered by the Debtors to support this mechanism. Subordination of the Lender's existing perfected assignment of rents and leases to a new lender is not fair and equitable

in the circumstances of this case where there is a $16.5 million shortfall based on the Debtors' own estimate of value of the Dime Building and the garage.

Third, although Nadhir testified that he intends to dismiss the Oakland County Circuit Court lawsuit if the third amended plan is confirmed, the fact remains that the third amended plan that was submitted to creditors for voting and was brought before the Court at the hearing on confirmation, still contains a preservation of this lawsuit against the Lender while locking the Lender in at the same time to a five year plan. That is not fair and equitable.

The final grounds argued by the Lenders that the third amended plan is not fair and equitable concerns the payment of pre-petition property taxes. Even though the Debtors propose to use $1,588,000.00 of rents they have collected during the bankruptcy case in part to pay administrative expense claims and unsecured creditors in cash, the third amended plan proposes that pre-petition property taxes of $550,000.00 be paid over five years after confirmation, despite the fact that the pre-petition property taxes are secured by a first lien on the Dime Building and garage senior to the Lender's lien upon those properties. In other words, while the Debtors have accumulated $1,588,000.00 of cash in the lockbox by collecting the rents from the Dime Building and the garage during the Chapter 11 cases, they do not propose to use those rents to pay the delinquent property taxes which are senior in priority to the Lender, but instead propose to use the Lender's rents to pay administrative expense claims and unsecured claims that are junior in priority to the Lender's claims. That is not fair and equitable. The Court finds that the third amended plan is not fair and equitable on all four of these grounds.

## D. Classification of Claims

The Lender also objects to the classification of its claims in the third amended plan. In order to be confirmed, a plan must meet the requirements of § 1129(a), including the requirement of § 1129(a)(10) that the plan is accepted by at least one class of impaired claims. In classifying claims, the general rules are that "[d]issimilar claims may not be classified together; [and] similar claims may be classified separately only for a legitimate reason." In re Chateaugay Corp., 89 F.3d 942, 949 (2nd Cir. 1996).

The manipulation of classes of claims in order to artificially create an accepting class of impaired claims is not permitted. Id. (finding that the "separate classification of unsecured claim for the sole purpose of creating an impaired assenting class is not permitted"); see also Teamsters National Freight Industry Negotiating Committee v. U.S. Truck Co. (In re U.S. Truck Co.), 800 F.3d 581, 586 (6th Cir. 1986) (noting the "potential for abuse would be significant" if a debtor's power to "segregate dissenting (impaired) creditors from assenting (impaired) creditors (by putting the dissenters into a class or classes by themselves)" was unlimited). "If the classifications are designed to manipulate class voting, . . . the plan cannot be confirmed. The separate classification of similarly situated claims violates section 1122 and is deemed to be improper separation of claims to manipulate voting." In re Porcelli, 319 B.R. 8, 10 (Bankr. M.D. Fla. 2004) (citations omitted).

"The proponent of the plan must demonstrate a justification for its classification scheme and that the classification is not motivated by the purpose of gerrymandering an affirmative vote of an impaired class." Id. (citation omitted). "[T]o warrant having separate classification of similar claims, the debtor must advance a legitimate reason supported by credible proof." In re Chateaugay Corp., 89 F.3d at 949 (citation omitted); see also In re Holley Garden Apartments, Ltd., 223 B.R.

822, 825 (Bankr. M.D. Fla. 1998) (finding the debtor "failed to prove a business justification for its separate classification" of an undersecured lender's deficiency claim when the only evidence was the testimony of the debtor's agent that she had done so on the advice of counsel).

The third amended plan classifies the Lender's claim entirely in Class I. It is the only claim in that class. The Lender's claim is "allocated" into a $20 million secured claim and a $16.5 million unsecured claim. Class IV claims consist of the claims of all other allowed general unsecured claims. The Lender asserts that by "allocating" a portion of the Lender's claim as unsecured, but keeping it out of Class IV with the other unsecured claims, the Debtors are attempting to artificially obtain an accepting class of unsecured claims. The Lender objects to the Debtors classifying both the Lender's secured claim and unsecured claim in Class I, and argues that the Debtors are doing so only to manipulate voting in an attempt to obtain confirmation.

The Debtors have not introduced any evidence that justifies separately classifying the Lender's unsecured claim from the unsecured claims of the other creditors in this case. The Debtors are correct in pointing out that the treatment for the Class IV unsecured claims may arguably be less favorable than the treatment of the Lender's unsecured claim in Class I. However, that fact does not respond to the Lender's objection that this unsecured claim is not being separately classified for any legitimate reason. With no evidence of a legitimate reason for this classification, the inference is strong that the Debtors have classified the Lender's unsecured claim within Class I and not with the other unsecured claims for the purpose of manipulating voting and gerrymandering the classes in an effort to gain confirmation. In any event, the Court concludes that the Debtors have failed to demonstrate any legitimate justification for classifying the Lender's unsecured claim separately from other unsecured claims.

## E. Substantive Consolidation

The Lender also objects to the third amended plan because it provides for substantive consolidation of the Debtors' estates. Substantive consolidation "is a judicially created doctrine that treats separate legal entities as if they were merged into a single entity, pooling the assets and liabilities of the two entities, so that the assets of the two entities may result in a common fund available to satisfy the debts of both entities." Simon v. ASIMCO Technologies, Inc. (In re American Camshaft Specialties, Inc.), 410 B.R. 765, 778 (Bankr. E.D. Mich. 2009). "[I]t is an extraordinary remedy to be utilized only where there are no other adequate remedies . . . ." Id. at 787. The fundamental purpose of substantive consolidation is "to ensure the equitable treatment of all creditors." Id. at 778.

> [W]hat must be proven . . . concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

Owens Corning, 419 F.3d at 211 (footnotes omitted); see also In re American Camshaft, 410 B.R. at 787.

The Debtors introduced no evidence to support their request under the third amended plan for substantive consolidation. In oral argument it appeared that the Debtors may have abandoned that request. In any event, there is no evidence to support it under any of the various standards of substantive consolidation that have been utilized by the Court, including this Court's recent decision in In re American Camshaft.

## F. Good Faith

Finally, the Lender objects that the third amended plan was not filed in good faith. To be confirmed, a plan must be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "Because the totality of the circumstances must be considered, no single test for good faith can be recited[.]" <u>Trident Associates Ltd. Partnership v. Metropolitan Life Insurance Co. (In re Trident Associates Ltd. Partnership)</u>, 52 F.3d 127, 131 (6th Cir. 1995). "[G]ood faith is an amorphous notion, largely defined by a factual inquiry," with "no single fact [being] dispositive[.]" <u>Id.</u> (quotation marks and citation omitted). Because the Court has determined that the plan is not feasible and is not fair and equitable, the Court will not address the Lender's objection based on a lack of good faith.

## VI. CONCLUSION

Nadhir impressed the Court as sincere and credible. With the exception of BOSC's failure to pay rent for the executive suites on the eighth floor of the Dime Building, the Lender does not object to the third amended plan by alleging any misconduct or wrongdoing by Nadhir. To the contrary, even some of the Lender's witnesses were complementary of the improvements that the Debtors had made to the Dime Building and the garage, and did not suggest to the Court that there is any question regarding Nadhir's integrity. As a successful developer of other properties, Nadhir appears in many respects to be the type of developer and investor that should be encouraged in making investments and other commitments to develop properties in Detroit, particularly in the troubled and declining downtown Detroit central business district. However, the Court's impressions of Nadhir and the Court's desire to see office buildings and other commercial ventures

succeed in Detroit do not give the Court license to dispense with the requirements for confirmation of a plan of reorganization under § 1129 of the Bankruptcy Code.

After sifting through the extensive evidentiary record made in this case, there are a number of facts that stand out. The Debtors' own disclosure statement starts from the premise that the Dime Building and the garage are worth only $20 million, leaving a substantial unsecured deficiency claim of $16.5 million. Except for Nadhir's belief that the properties are really worth in the vicinity of $30 million, the Debtors introduced no probative evidence that the values of the Dime Building and the garage exceed $20 million as set forth in the Debtors' own disclosure statement. In contrast, the Lender introduced extensive and credible evidence to support an even lower value of the Dime Building and the garage of $16.1 million. While the Court accepts the Lender's evidence and finds the value of the Dime Building and garage to be $16.1 million, the larger point here is that there is a huge deficiency claim, regardless of which value the Court had ultimately accepted. The Debtors argue that the Court should nonetheless confirm the third amended plan because it proposes to pay the Lender in full both with respect to its secured claim and its unsecured claim. According to the Debtors, in five years, if all of the plan payments are made, they will still owe the Lender $30 million in a balloon payment. The Court is struck by the fact that the Debtors' only identified source of revenue to pay the balloon payment consists of the rents from the Dime Building and the revenues from the garage. Yet those are the very same components of income upon which the valuations of the properties are based. The Debtors have failed to adduce any credible evidence that they will have the ability to make the balloon payment of $30 million in five years from the rents and revenues generated by the Dime Building and the garage. Nor did they adduce any evidence at all to suggest that they will have any other sources of income at that time. The Debtors simply

-72-

want to force the Lender to gamble that in five years the Debtors will be able to pay the Lender in full because the values of the Dime Building and the garage will somehow dramatically improve. The evidence does not support the Debtors' confidence in this gamble. The evidence shows that the Debtors have properties worth at most $20 million, that they somehow hope will have sufficient value in five years to enable them to pay $36.5 million to the Lender. The evidence does not establish that it is more likely than not that the Debtors will make these payments.

In closing argument, counsel for the Debtors tried valiantly to improve the third amended plan in the hope of gaining confirmation. Counsel for the Debtors first stated that he would amend the plan to make the entire Class I claim of the Lender secured. Yet, as explained in the opinion, the law does not provide the Debtors that option. Next, Debtors' counsel said that the Debtors would dismiss the litigation they have brought against the Lender in Oakland County Circuit Court, even though the third amended plan says otherwise. Finally, Debtors' counsel states that Nadhir "shall" contribute $200,000.00 over the life of the plan for tenant improvements, even though the third amended plan says the individual guarantors have the option to make such contribution. Moreover, on the day after the conclusion of the confirmation hearing on the third amended plan, after the Court had taken under advisement the Debtors' request for confirmation of the third amended plan and the Lender's objections to confirmation of the third amended plan, the Debtors filed yet another plan, a fourth plan, on November 13, 2009 (docket entry no. 254). That plan provoked another objection from the Lender (docket entry no. 258) on November 17, 2009, followed by the Debtors' motion to strike the Lender's objection (docket entry no. 262), and yet another response to that motion by the Lender (docket entry no. 263). There are several points that need to be made about both the Debtors' counsel's efforts to try to sweeten the third amended plan during

closing arguments, and the Debtors' filing of yet a fourth plan after the completion of the trial with respect to the Debtors' request for confirmation of the third amended plan and the Lender's objections to it.

First, the Court construes all of these actions as good faith efforts to try to improve the third amended plan in the hope of gaining confirmation. The Debtors' counsel's modifications at closing argument to the third amended plan should be and are considered by the Court. But the Court considers it improper to file another amended plan *after* the Court has conducted a five day trial, plowed through mountains of briefs, listened to numerous witnesses, inspected numerous documents, and has taken the Debtors' request for confirmation of that plan and the Lender's objections to it under advisement. Once the confirmation hearing was brought to a close, the Court's task is to rule upon the Debtors' request for confirmation and the Lender's objections to it. The Court's ruling should not have to hit a moving target. The issues that were joined by the Debtors' proposal of the third amended plan and the Lender's objections to it were properly and fully developed before the Court at the conclusion of the trial on November 12, 2009, and need to be adjudicated by the Court before the Court will consider some other plan. The Court therefore disregards for purposes of this opinion the fourth amended plan filed by the Debtors on November 13, 2009 (docket entry no. 254).

Second, even though the Court has determined to disregard the fourth amended plan filed after the conclusion of the confirmation hearing, the Court did examine it, and can say without qualification that had the changes contained in it been made to the third amended plan before the confirmation hearing, the result of the confirmation hearing would have been the same. This new plan does not change in any way the fundamental facts of this case. Those facts are that the

-74-

Lender's claims are grossly undersecured. Regardless of which measurement of value is used, the properties do not sufficient value to pay the claims to date, nor does the evidence show that it is more likely than not that they will have sufficient value in the future to pay the Lender's Class I claims, as the third amended plan promises, in five years. Another important and unalterable fact is that the only funds that the Debtors have to make any payments on confirmation for administrative expenses and unsecured claims consist of rents that have been collected during the bankruptcy cases that are held by the Lender in a lockbox. The analysis is simple. The Debtors have not shown that the Lender's interest in these rents will be adequately protected by the Debtors' use of those rents to pay administrative expenses and pre-petition unsecured claims, all of which are junior in priority to the Lender's claim that is secured by its first perfected security interest in the rents and revenues. The Debtors have neither the funds required to make cash payments on confirmation, nor sufficient rents to make the payments to the Lender going forward, nor the funds to make the balloon payment of $30 million in five years. The Lender correctly objects that the third amended plan does not meet the requirements of § 1129 of the Bankruptcy Code in a number of respects including, most importantly, because it is not feasible and because it is not fair and equitable in its treatment of the Lender's claims.

For these reasons, the Court concludes that the Lender's objections to confirmation of the third amended plan must be sustained and confirmation of the third amended plan must be denied. The Court will enter a separate order consistent with this opinion.

**For publication**


```
Signed on December 07, 2009
                                 _____/s/ Phillip J. Shefferly_____
                                       Phillip J. Shefferly
                                       United States Bankruptcy Judge
```